# NO. 12-16-00049-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *RED BALL OXYGEN COMPANY, INC.,*<br>*APPELLANT* | § | *APPEAL FROM THE* |
| *V.* | § | *COUNTY COURT AT LAW NO. 2* |
| *SOUTHWEST RAILROAD CAR PARTS COMPANY AND AIR LIQUIDE INDUSTRIAL U.S., L.P.,*<br>*APPELLEES* | § | *GREGG COUNTY, TEXAS* |

## *OPINION*

This case involves a dispute over a supply contract between Red Ball Oxygen Company, Inc. and Southwest Railroad Car Parts Company which led to litigation involving a suit on account, tortious interference, and reciprocal breach of contract claims. In six issues, Red Ball asserts the trial court misconstrued the contract, Southwest, not Red Ball, breached the contract, and therefore Red Ball, not Southwest, is entitled to damages and attorney's fees. We affirm.

## BACKGROUND

In 2005, Southwest agreed to a long-term contract with Red Ball for the purchase of oxygen and propane. In January 2012, David Toarmina, Southwest's vice president and general counsel, questioned price increases instituted by Red Ball, as well as certain other charges, and refused to pay a portion of billed amounts. In February 2012, Toarmina notified Red Ball that Southwest would be cancelling the contract effective June 1, 2012, but asked Red Ball to submit a proposal for supplying oxygen to Southwest after that date. The parties were unable to resolve the disputes concerning the 2005 contract or reach a new agreement. Southwest entered into

contracts with other suppliers, Air Products and Air Liquide Industrial U.S., L.P., effective June 1, 2012.

Red Ball sued Southwest for suit on account and breach of contract, and requested a declaration that Southwest prematurely terminated the contract and that the contract was valid until November 4, 2015. Red Ball also sued Air Liquide for tortious interference with contract. Red Ball prayed for actual damages against Southwest, damages against Southwest and Air Liquide for lost profits and rentals, exemplary damages against Air Liquide, attorney's fees, and a declaration that the contract was enforceable through November 4, 2015.

Southwest and Air Liquide asserted numerous affirmative defenses to Red Ball's causes of action, and Southwest alleged counterclaims for breach of contract, declaratory relief, and violations of the Texas Deceptive Trade Practices Act (DTPA). After a trial before the court, the court rendered judgment that Red Ball prevailed in part on its suit on sworn account and that Red Ball take nothing on its suit for tortious interference against Air Liquide. The court also held that Southwest repudiated the agreement in good faith and the agreement terminated effective June 1, 2012, and that Southwest should prevail on its breach of contract claim, but take nothing on its DTPA claim. The court awarded damages and attorney's fees to Southwest.

### COST INCREASES AND FEES

In its first issue, Red Ball contends that the trial court erred in interpreting the contract. It argues that the contract provided for price increases during the contract's term and did not limit those increases to increases in Red Ball's costs of bulk oxygen as found by the trial court. It argues that the pricing language provided that Red Ball was entitled to raise its prices for its products as its "operational and product costs" increased.

In its second issue, Red Ball asserts that the trial court erred in ruling that Red Ball breached the contract by raising prices when the evidence establishes that the parties intended "cost increases" to include all costs, not just product costs. Red Ball argues that, even if the contract is ambiguous, the only evidence in this case supports Red Ball's interpretation. It relies on the testimony of its senior vice president of business development, Jarrod Lipsey, that the term "costs" included the everyday cost of doing business. It further relies on the testimony of Ralph Thomas, Red Ball's vice president of finance, who testified that "cost increases" means increases in the cost of goods sold and overhead costs combined together. Therefore, the

argument continues, there is no evidence that Red Ball breached the contract by raising its prices by more than the direct amount charged by Red Ball's supplier.

In its third issue, Red Ball contends the trial court erred in ruling that Red Ball was not entitled to charge hazardous material fees, fuel surcharges, and delivery fees because the contract allows those charges. Red Ball asserts that the evidence conclusively establishes that it did not breach the contract by charging for those items. Red Ball argues that the contract "specifically discusses Surcharges and the effect of changes in those over the term of the Contract." Therefore, the trial court's finding that the contract does not provide for Red Ball to invoice Southwest for surcharges makes the language regarding those charges surplusage, violating a cannon of interpretation. It argues that the contract specifies that Red Ball was to provide liquid oxygen to Southwest at Red Ball's facility, and Southwest was then responsible for shipping costs after that point. Thus, Red Ball was entitled to bill Southwest delivery and fuel charges under the term "F.O.B. Seller's location." Further, the parties operated under the contract for more than six years with Red Ball passing on those charges to Southwest without complaint from Southwest. Accordingly, Red Ball argues that "all competent evidence establishes that the only viable interpretation [of the contract] is that the parties intended that the Contract allow for Red Ball to bill Southwest for the surcharges and to increase those charges from time to time." Thus, the trial court's finding to the contrary "is in contradiction of the plain language of the Contract and the evidence and should be reversed."

## Standard of Review

In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence used to support them just as we would review a jury's findings. *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000). A party who challenges the legal sufficiency of the evidence to support an issue upon which it did not have the burden of proof at trial must demonstrate on appeal that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). When reviewing a no evidence issue, we determine whether the evidence at trial would enable reasonable and fair minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we must credit favorable evidence if a reasonable finder of fact could and disregard contrary evidence unless a reasonable finder of fact could not. *Id*. If there is any

evidence of probative force to support the finding, i.e., more than a scintilla, we will overrule the issue. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998).

We review the trial court's legal conclusions concerning an unambiguous contract de novo. *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). We will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.−Houston [1st Dist.] 2007, no pet.). The trial court's conclusions of law are not subject to challenge for lack of factual sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *Id*.

## Applicable Law

The construction of an unambiguous contract is a question of law for the court, which we may consider under a de novo standard of review. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). Our primary concern is to ascertain the true intent of the parties as expressed in the instrument. *Wood Care Ctrs., Inc. v. Evangel Temple Assembly of God of Wichita Falls, Tex.*, 307 S.W.3d 816, 820 (Tex. App.−Fort Worth 2010, pet. denied). When discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless. *Id*. An unambiguous contract's meaning and intent is determined from the four corners of the document without the aid of extrinsic evidence. *Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 595 (Tex. App.−Dallas 2015, pet. denied). We give contract terms their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). We construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid a construction which is unreasonable, inequitable, and oppressive when possible. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam).

### *Increased Costs*

The trial court's finding of fact nine provides as follows:

> The Court finds that the phrase "increased costs incurred by Seller" has only one reasonable meaning, being those costs incurred by Red Ball directly attributable to the Agreement. It would not be a reasonable reading of the phrase "increased costs incurred by the Seller" to cover any or all general overhead costs of Red Ball coming into existence over the course of a five year contract.

4

In its conclusion of law five, the trial court explained that it construed the phrase "increased costs incurred by the Seller" to mean those costs incurred by Red Ball directly attributable to the contract, i.e. those costs Red Ball had to pay its supplier, Praxiar, for the oxygen and other materials.

The trial court determined that the contract was unambiguous and that determination has not been questioned on appeal. Accordingly, we review the trial court's construction de novo. *Tawes*, 340 S.W.3d at 425. We decline Red Ball's invitation to consider evidence of the parties' intent. The law is clearly established that we look solely to the four corners of the contract to determine its meaning and intent. *Joachim*, 468 S.W.3d at 595.

Paragraph 9 of the contract provides as follows:

> 9. Price
> From time to time during the term of this Agreement, Seller shall have the right to increase the prices set forth on Schedule "A" due to cost increases incurred by the Seller.
> For purposes of this paragraph, changes in prices attributable to: (1) replacements of or additions to Seller's equipment pursuant to paragraph 6c or (2) changes in delivery charge, hazardous material charge, equipment and maintenance charges, surcharges or maintenance on Purchaser-owned equipment shall not constitute price increases.

Paragraph 9 plainly states that Red Ball has the right to increase prices set forth on Schedule A. Schedule A lists pricing for rental of a 6000 gallon tank and the price per hundred cubic feet of liquid oxygen. It does not list pricing for any other item. Therefore, the contract does not allow Red Ball to pass along cost increases due to other expenses Red Ball may incur such as operational and overhead costs. Red Ball's suggested interpretation is unreasonable. *See Frost Nat'l Bank*, 165 S.W.3d at 312. The trial court did not err in construing this provision of the contract.

We turn now to Red Ball's assertion that "[t]here is a complete lack of evidence to support Southwest's claim that Red Ball breached the Contract by raising its prices by more than the direct amount charged by Red Ball's supplier." Apparently, Red Ball is arguing there is no breach of contract when interpreting the contract as asserted by Red Ball, as opposed to the trial court's interpretation. However, we will address the argument in light of our determination that the trial court correctly interpreted the contract.

5

Lipsey testified that the cost increases Red Ball charged Southwest "were calculated based on the everyday cost of doing business as a company that relate to many other things, other than just the cost of the product." He specifically testified that Red Ball had to cover all of its overhead costs. Thomas testified that Red Ball's cost increases during the term of the contract included increases in the cost of goods sold and overhead costs combined together. Thus, Red Ball's own evidence shows that its charges were based on all of its costs, including overhead, contrary to the terms of the contract. Its argument that it was justified in passing those costs along to Southwest does not change the meaning of the contract or the fact that Red Ball breached it. The evidence is legally sufficient to support the trial court's finding that Red Ball breached the contract by charging Southwest for amounts not authorized by the contract. *See ExxonCorp.*, 348 S.W.3d at 215. We overrule Red Ball's issues one and two.

### *Additional Fees*

In finding of fact sixteen and conclusion of law five, the trial court determined that there is no provision in the contract allowing Red Ball to charge Southwest for hazardous materials, delivery fees, or fuel surcharges. In conclusion of law four, the court determined that Southwest should recover the charges for hazardous materials, delivery fees, and fuel surcharges, reaching back four years from January 30, 2014, the date Southwest filed its counterclaims against Red Ball.

Contrary to Red Ball's assertion that the contract "discusses" surcharges and the "effect of changes" in surcharges, the contract makes only one reference to delivery charges, hazardous material charges, or surcharges in the single sentence in paragraph 9 of the contract, quoted above. Contrary to Red Ball's assertion that the contract allows it to charge Southwest for those items, the contract does not include any language stating that Southwest is responsible for paying for those items. After authorizing Red Ball to increase certain prices of items named in Schedule A, the contract specifies that changes in surcharges shall *not* constitute a price increase. Therefore, pursuant to the plain language of the contract, it is properly construed to mean that Red Ball cannot charge Southwest for delivery charges, hazardous material charges, or fuel surcharges. *See Dorsett*, 164 S.W.3d at 662.

Neither are we persuaded by Red Ball's argument that a single sentence in paragraph 11 of the contract is to be interpreted that Southwest must pay delivery and fuel charges. Paragraph 11 provides as follows:

6

11. Payment

Seller will invoice purchaser upon delivery. Any sales, use, excise or other tax imposed by reason of any sale, delivery, charge or furnishing of any item hereunder will be paid by Purchaser. Terms of delivery shall be F.O.B. Seller's location. Terms of payment will be net 30 days following date of invoice. A service charge of 1.5% per month will be charged on any payment not made within 30 days of the invoice date.

Red Ball, a distributor, obtained oxygen in bulk from its supplier, Praxair. Lipsey testified that Praxair delivered the oxygen from Praxair's manufacturing plant to the 6000 gallon tank at Southwest's Longview location "for Red Ball." Lipsey also testified that Red Ball passed expenses such as those associated with hazardous materials charges, fuel charges, and delivery fees to its customers. The evidence reflects that they billed Southwest for these charges over the course of their contractual relationship. Red Ball relies on the parties' use of the term "F.O.B. Seller's location" to claim the right to charge delivery and fuel charges. "Trade usage" evidence may be admissible to show that the meaning of a certain term or phrase is the one which is so regularly observed in an industry so as to justify an expectation that it will be observed with respect to a particular agreement. *See **Nat'l Union Fire Ins., Co. v. CBI Indus., Inc.***, 907 S.W.2d 517, 521 & n.6 (Tex. 1995) (per curiam). However, no such evidence was presented here to explain the meaning of the term. While Lipsey testified that it is industry standard for all bulk gas users to pay delivery, hazardous materials fees, and surcharges, he did not specify language normally included in bulk gas contracts to indicate when this industry standard has been embraced. Southwest's plant manager testified that she did not know what "F.O.B." means. We note that the term F.O.B. means "free on board" and is a delivery term indicating that the seller bears the expense of putting the goods into the possession of the carrier or transporting the goods to the place of destination. TEX. BUS. & COM. CODE ANN. § 2.319(a) (West 2009).

The phrase is included in a single sentence in a paragraph regarding the process by which Red Ball would bill Southwest. There is no indication on the face of the contract that the phrase "F.O.B. Seller's location" ordinarily means that the purchaser must pay delivery and fuel charges when the product does not originate from seller's location. Based on the Business and

7

Commerce Code, the logical interpretation is that Red Ball bears the expense, if any, of transporting the goods to its location. *See **id**.*[1]

Once again, Red Ball conflates the concepts of contract construction and sufficiency of the evidence. It argues that the contract allows it to charge hazardous material charges, fuel surcharges, and delivery charges therefore there is no evidence that it breached the contract by charging these fees. Because the trial court did not err in construing the contract to mean that Red Ball is not entitled to charge hazardous material charges, fuel surcharges, or delivery charges, and Red Ball admits it charged Southwest for those fees, the evidence supports the trial court's determination that Red Ball breached the contract. *See **Exxon Corp.***, 348 S.W.3d at 215. We overrule Red Ball's third issue.

## PERFORMANCE BY SOUTHWEST

In its fourth issue, Red Ball contends the trial court erred in ruling that Southwest justifiably repudiated the contract even though Southwest demanded that Red Ball continue to operate under the contract and, therefore, Southwest's counterclaim for breach of contract is barred. It argues that, if Red Ball breached the contract by raising its liquid oxygen prices, Southwest had the option to continue operating under the contract or repudiate the contract. Red Ball asserts that Southwest attempted to do both by continuing to order liquid oxygen while refusing to pay the full amounts invoiced and then breached the contract by terminating before the termination date.

In conclusion of law ten, the trial court determined that Southwest acted in good faith in repudiating and terminating the contract as a result of Red Ball's prior breach of the contract. In conclusion of law eleven, the court further determined that Red Ball's prior breach of the contract by increasing prices more than the amount it actually incurred in costs excused Southwest from paying the amounts Red Ball charged. These conclusions are supported by finding of fact eleven. There, the court found that Southwest acted in good faith in repudiating the contract, declaring it breached, and ending the contract effective June 1, 2012. It also found that Red Ball's prior breach of the contract by increasing prices more than its costs increased excused any further performance on Southwest's part.

---

[1] We do not decide whether Red Ball could have charged that portion of the delivery expense from its place of business to Southwest's place of business as there is no evidence in the record that the product was delivered to Red Ball's place of business.

When a contracting party commits a material breach, the non-breaching party must elect between two courses of action, either continuing performance under the contract or ceasing performance and terminating the contract. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam); *Gupta v. Eastern Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 756 (Tex. App.−Houston [14th Dist.] 2004, pet. denied). This rule deems treating a contract as continuing after a breach as a waiver of the excuse for non-performance. *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887-88 (Tex. App.−San Antonio 1996, writ denied).

In January 2012, Toarmina notified Red Ball that he was reviewing their contract and asked for documentation establishing the validity of Red Ball's price increases. He explained that, until Red Ball can justify the increases, Southwest would pay the original contract price. A month later, Toarmina notified Red Ball that he had concluded that Red Ball's price increases constituted a breach of contract. Therefore, Southwest cancelled the contract effective June 1, 2012. Toarmina contacted several suppliers, including Red Ball, requesting proposals for supplying oxygen to Southwest after June 1. Red Ball responded with a demand that Southwest remit the payments it "short-payed" [sic] but did not present a proposal for a new contract. Further, Red Ball's counsel made a settlement offer in April. Included in that letter was the statement that until the matter is resolved, or Southwest brings its account current, Red Ball requires cash payment for all deliveries. Toarmina rejected the offer and renewed his prior offer to continue to pay the original contract price. He explained that, if that is not acceptable to Red Ball, counsel can tell them not to sell oxygen to Southwest and, when the tank is empty, Red Ball can come and get it. Shortly thereafter, on May 2, Toarmina sent a letter to Red Ball outlining his terms regarding disposition of the tank. Sometime in April, Southwest signed a contract with Air Liquid to provide bulk oxygen beginning June 1. On May 11, because he and Red Ball were unable to agree on pricing, Toarmina arranged for Air Liquid to provide a small amount of oxygen in cylinders until their bulk product agreement went into effect on June 1.

Based on the record, we disagree that Southwest continued performance under the contract. Southwest made it clear, in January 2012, that due to Red Ball's breach of contract, it would no longer pay the totals demanded by Red Ball. Southwest stated in writing that it was canceling the contract effective June 1 and openly shopped for a new contract. Toarmina never wavered in his determination that Red Ball was in the wrong and had breached their contract.

9

Both parties acknowledged that it would take some time to transition from one supplier to another. During the time leading up to June 1, Southwest was actively trying to extricate itself from its arrangement with Red Ball while making certain its oxygen needs were met so it could continue in business. As we explained above, the evidence shows that Red Ball breached the contract. Therefore, Southwest was excused from any further obligation to perform. *See **Long Trusts v. Griffin***, 222 S.W.3d 412, 415 (Tex. 2006) (per curiam). The record shows that Southwest did not continue to perform under the contract. Accordingly, the trial court's conclusions ten and eleven are not erroneous as a matter of law. *See **Brown***, 236 S.W.3d at 348. We overrule Red Ball's fourth issue.

## ATTORNEY'S FEES

In its fifth issue, Red Ball asserts that the trial court improperly awarded attorney's fees to Southwest and failed to award attorney's fees to Red Ball. It asserts the trial court abused its discretion by finding that Red Ball did not timely designate an expert to testify regarding attorney's fees because Southwest was not unfairly prejudiced by Red Ball's late designation of its attorney's fees expert. It argues that the trial court should have offset Southwest's award by Red Ball's attorney's fees because it was also a prevailing party.

Based on its arguments in its first four issues, Red Ball asserts that the evidence is insufficient to sustain any of Southwest's claims, Southwest breached the contract, and Red Ball is therefore entitled to recover its attorney's fees. For the reasons articulated above as we overruled issues one through four, we disagree with Red Ball's assertion that it is entitled to attorney's fees on that basis.

The trial began on August 4, 2015, with the parties stating in open court that they had entered into an agreement that the issue of attorney's fees would be submitted to the court by affidavit "subject to parties' objections to timeliness of any designation of experts on attorney's fees or other issues that the affidavits raise." In its September 8, 2015 letter ruling, the court stated that, although the parties had announced at the commencement of the proceeding that an agreement had been reached on attorney's fees, the court had not received any affidavits on the issue of attorney's fees. Southwest moved for an award of attorney's fees with supporting documentation. Red Ball also moved for attorney's fees, filing a motion supported by Red Ball's

10

attorney's affidavit and billing records.  Red Ball prayed that Southwest's motion for attorney's fees be denied or, alternatively, offset by Red Ball's attorney's fees.

Southwest objected to Red Ball's motion, arguing that Red Ball should not be awarded attorney's fees because it did not timely designate any experts to testify about attorney's fees.  It asserted that the court had ordered Red Ball to designate any expert witness by January 14, 2014, but Red Ball designated its attorney's fees expert on July 22, 2015.

The trial court found for Red Ball on its suit on account claim to the extent of the unpaid rate increases directly attributable to Praxair rate increases from December 2011 through May 2012, i.e., $8,189.06.  However, the trial court found that Red Ball is not entitled to attorney's fees because it did not timely designate an expert to testify regarding the reasonableness and necessity of its attorney's fees.

When a party fails to supplement a discovery response in a timely manner, the evidence will be excluded unless the court finds that there was good cause for that failure or the failure to timely supplement will not unfairly surprise or prejudice the other party.  TEX. R. CIV. P. 193.6(a); *Beard Family P'ship v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 850 (Tex. App.−Austin 2003, no pet.).  To escape Rule 193.6's automatic exclusion provision, the burden is on the party seeking to admit the evidence to establish good cause or the lack of unfair surprise or unfair prejudice.  TEX. R. CIV. P. 193.6(b); *F & H Invests., Inc. v. State*, 55 S.W.3d 663, 671 (Tex. App.−Waco 2001, no pet.).  The record must support a finding of good cause or lack of unfair surprise or prejudice.  TEX. R. CIV. P. 193.6(b).  The trial court's decision to exclude an expert who has not been properly designated to testify is reviewed for abuse of discretion.  *May v. Ticor Title Ins.*, 422 S.W.3d 93, 104 (Tex. App.−Houston [14th Dist.] 2014, no pet.).

Red Ball's counsel's October 22, 2015 affidavit in support of its motion for attorney's fees never addressed the timeliness problem, good cause for its failure to timely supplement, or whether Southwest would be surprised or prejudiced by Red Ball's failure to timely name an expert on attorney's fees.  Red Ball did not present any evidence showing the application of either of the two exceptions to the rule's automatic exclusion.  Therefore, the trial court had no choice but to exclude Red Ball's evidence of attorney's fees.  *See F & H Invests., Inc.*, 55 S.W.3d at 671.  We overrule Red Ball's fifth issue.

11

## DAMAGES

In its sixth issue, Red Ball contends that this court should reverse the trial court's judgment and render judgment that it be awarded damages for breach of contract and on a sworn account. The basis for this argument is Red Ball's assertion that, as it showed in its previous issues, the evidence is insufficient to sustain the trial court's rulings in favor of Southwest. Red Ball argues that the evidence conclusively establishes that it did not breach the contract and Southwest did breach the contract. As we have explained above, the evidence establishes just the opposite. Due to Red Ball's failure to identify any trial court error, we conclude that it is not entitled to reversal or an award of damages. *See Velvet Snout, L.L.C. v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.−El Paso 2014, no pet.). We overrule Red Ball's sixth issue.

## DISPOSITION

Having overruled Red Ball's six issues, we *affirm* the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered May 31, 2017.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

12



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 31, 2017**

**NO. 12-16-00049-CV**

**RED BALL OXYGEN COMPANY, INC.,**
Appellant
V.
**SOUTHWEST RAILROAD CAR PARTS COMPANY
AND AIR LIQUIDE INDUSTRIAL U.S., L.P.,**
Appellees

Appeal from the County Court at Law No. 2
of Gregg County, Texas (Tr.Ct.No. 2012-1074-CCL2)

THIS CAUSE came to be heard on the oral arguments, appellate record, and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellant, **RED BALL OXYGEN COMPANY, INC.,** for which execution may issue, and that the decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*