

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE VELVET SNOUT, LLC, | § | |
| Appellant, | § | No. 08-12-00202-CV |
| | § | |
| v. | § | Appeal from |
| | § | |
| VERNON E. SHARP, JR., INDIVIDUALLY AND D/B/A | § | 160th District Court |
| SHARP FLOORS, AND JAMES SHARP, INDIVIDUALLY AND D/B/A | § | of Dallas County, Texas |
| SHARP FLOORS, | § | (TC # 11-00828) |
| | § | |
| Appellee. | § | |

## **O P I N I O N**

The Velvet Snout, LLC appeals a take nothing judgment rendered against it following a bench trial in a suit for breach of contract. For the reasons that follow, we affirm.

### **FACTUAL AND PROCEDURAL SUMMARY**

The Velvet Snout is a dog grooming and boarding facility owned by Laura Couch. In December 2006, it contracted with Vernon and James Sharp, d/b/a Sharp Floors (collectively, the "Sharps"), to install rubber flooring. In late summer or early fall of 2007, problems began to appear in the seams of the flooring. Couch contacted the Sharps about the problem, and the Sharps sent someone to reseal the seams. Thereafter, the problems reappeared and worsened, resulting in lifting and separation of the flooring and accumulation of water in the adjoining

walls. Couch maintains that the Sharps were contacted about these additional issues but were nonresponsive. The Sharps counter that they did not learn about the subsequent problems until December 2010, when they received the pre-suit demand letter. In either event, the Sharps neither inspected nor repaired the subsequent problems. Instead, the Velvet Snout hired third parties to make repairs to the flooring and walls at its own expense, and additional repairs are still needed. The Velvet Snout filed suit against the Sharps on January 26, 2011, alleging breach of contract and fraud claims. Following a bench trial, the court entered a take nothing. The Velvet Snout requested the entry of findings of fact and conclusions of law, which the trial court signed on May 4, 2012.

## DEEMED ADMISSIONS

In Issue One, the Velvet Snout complains of the trial court's findings that certain deemed admissions were too vague to support the breach of contract claim. The relevant admissions provided:

- Defendants did not substantially perform all their contractual obligations required by the contract attached to plaintiff's original petition.

- Defendants did not timely perform all their contractual [sic] related to installing the floor.

.    .    .

- Defendants' nonperformance constitutes a breach of contract related to installing the floor.

Regardless of whether they are vague, the admissions are sweepingly broad and seek to preclude a presentation on the merits. Such requests cannot be deemed admitted, and they will not support a judgment. *Lucas v. Clark*, 347 S.W.3d 800, 803-04 (Tex.App.--Austin 2011, pet. denied).

2

Requests for admission were "never intended to be used as a demand upon a plaintiff or defendant to admit that he had no cause of action or ground of defense." *Wheeler v. Green*, 157 S.W.3d 439, 443 (Tex. 2005), *quoting Sanders v. Harder*, 148 Tex. 593, 227 S.W.2d 206, 208 (1950). When a party relies on merit-preclusive deemed admissions, "due process concerns may arise." *Lucas*, 347 S.W.3d at 804, *citing Wheeler*, 157 S.W.3d at 443, and *In re Rozelle*, 229 S.W.3d 757, 764 (Tex.App.--San Antonio 2007, orig. proceeding). *Lucas* disapproved of the following deemed admission for these very reasons: "As a proximate result of your breaching the contract made the basis of this suit, the Plaintiffs have suffered consequential damages in an amount not less than ten million dollars." *Id*. at 802. *See also in re Estate of Herring*, 970 S.W.2d 583, 589 (Tex.App.--Corpus Christi 1998, no pet.)(judgment not supported by deemed admissions styled "[a]dmit you have not been injured in any manner as a direct result of the alleged acts," and "[a]dmit that [wife] did not transfer community property . . . without your knowledge and consent"); *Birdo v. Hammers*, 842 S.W.2d 700, 701 (Tex.App.--Tyler 1992, writ denied)("Admit or deny that each allegation made in the Amended Original Petition filed in this case is true."); *LRT Record Servs., Inc. v. Archer*, No. 05-00-00324-CV, 2001 WL 221563, at *1 (Tex.App.--Dallas Mar. 7, 2001, no pet.)(not designated for publication)("[a]dmit that you were negligent and thereby caused the Plaintiff damages, as alleged in his live pleading"). Because we agree with the analysis of these opinions, we overrule Issue One.

## SUFFICIENCY OF THE EVIDENCE

The Velvet Snout next challenges the sufficiency of the evidence to support the following findings of fact:

- The Velvet Snout, Inc. did not prove by a preponderance of the evidence that Defendants failed to comply [with] their agreement to install flooring at the Velvet Snout, Inc.'s business.

3

- The Velvet Snout, Inc. did not prove by a preponderance of the evidence that Defendants failed to install properly the flooring at the Velvet Snout, Inc.'s business.

. . .

- The Velvet Snout, Inc. did not prove by a preponderance of the evidence that it suffered damages resulting from Defendants' failure to comply with any agreement between The Velvet Snout, Inc. and the Defendants.

- The Velvet Snout, Inc. did not prove by a preponderance of the evidence that the Defendants failed to comply with any agreement between The Velvet Snout, Inc. and the Defendants.

### *Standards of Review*

When a party attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that the evidence establishes conclusively, or as a matter of law, all vital facts in support of the finding sought. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). A trial court's findings of fact in a bench trial have the same weight as a jury verdict and are reviewed for legal and factual sufficiency under the same standards. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We must not substitute our opinion on witness credibility for that of the trial court. *City of Keller v. Wilson*, 168 S.W.3d 802, 819-20 (Tex. 2005). We review the evidence in the light most favorable to the trial court's findings, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *Id*. at 827. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Sterner v. Marathon Oil Co*., 767 S.W.2d 686, 690 (Tex. 1989).

When a party who had the burden of proof complains of the factual insufficiency of an adverse finding, it must demonstrate that the finding is contrary to "the great weight and

4

preponderance of the evidence." *Dow Chemical*, 46 S.W.3d at 242. We consider and weigh all the evidence and set aside the adverse finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

The Velvet Snout had the burden of proof on its breach of contract claim. The four elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach. *McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 477 (Tex.App.--El Paso 1993, no writ). The last element encompasses a causation requirement. *Pagosa Oil and Gas, L.L.C. v. Marrs and Smith Partnership*, 323 S.W.3d 203, 215 (Tex.App.--El Paso 2010, pet. denied), *citing Prudential Securities, Inc. v. Haugland*, 973 S.W.2d 394, 396-97 (Tex.App.--El Paso 1998, pet. denied). Specifically, the evidence must show that the damages are the "natural, probable, and foreseeable consequence" of the defendant's conduct. *Haugland*, 973 S.W.2d at 397, *citing Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981), and *Winograd v. Clear Lake City Water Authority*, 811 S.W.2d 147, 156 (Tex.App.--Houston [1st Dist.] 1991, writ denied). "The absence of this causal connection between the alleged breach and the alleged damages will preclude recovery." *Id.*, *citing Nelson Cash Register, Inc. v. Data Terminal Systems, Inc.*, 671 S.W.2d 594, 600 (Tex.App.--San Antonio 1984), *aff'd*, 762 S.W.2d 744 (Tex. 1988).

### *Did the Sharps Breach The Contract?*

The Velvet Snout maintains that the Sharp's initial installation of the flooring was substandard and constituted a breach of the contract's provision that all work would be performed in workmanlike manner. It elicited expert testimony that the installation was performed poorly. Melissa Martin testified that based on her inspection of the flooring, the

5

installers "didn't," in her opinion, "know what they were doing." Jay Epp likewise testified that the flooring was "poorly installed." Epp based his opinions, in large part, upon the written report of a third expert, Mike Currin, who did not testify at trial. In his report, Currin opined that the installation was "not performed as described in the manufacturer's installation manual." The Sharps did not introduce any countervailing expert evidence. Vernon Sharp was not present during the installation of the flooring. And while James Sharp was briefly on site, he could not recall whether he was present during the sealing of the seams, which was the focus of the Velvet Snout's experts' opinions. Despite the Sharp's lack of contrary evidence regarding workmanship, the trial court's findings were nonetheless supported by other evidence related to causation. This evidence not only supported the trial court's negative causation finding, but also raised questions that the court, as a reasonable factfinder, could have relied on to disregard the Velvet Snout's expert's opinions about breach. *See Wilson*, 168 S.W.3d at 827.

### *Were the Damages Caused by the Installation Work?*

As James Sharp explained during his testimony, while there is no dispute that something went wrong with the Velvet Snout's floor, there is a considerable dispute about how and why. The trial court heard evidence on at least two fact issues related to causation. The first concerns the differing methods by which rubber flooring can be installed. The second concerns subsequent repairs that were performed by third persons.

The flooring can be installed through either a heat welding or chemical welding process. The evidence at trial established that heat welding is the appropriate method for floors that will be subjected to substantial amounts of water. Chemical welding is substantially less suitable for wet environments. Melissa Martin testified that chemical welding was only appropriate in "an area that wouldn't have a lot of water," such as a gymnasium. Similarly, Vernon Sharp testified

6

that "[w]ith chemical weld damp mopping is about all that's allowed." Laura Couch discussed both installation methods with James Sharp and a representative of the product's manufacturer. Ultimately, she chose the chemical weld application. Couch testified that differences in cost were never even discussed, and that her decision was based entirely on assurances that "[f]or [her] use, the chemical weld should be appropriate." James Sharp refuted her supposition:

> [W]e asked the questions about what's going to be on here. She [Laura Couch] showed me, we talked about it. And as [Couch] stated in her testimony, we talked about how much moisture, it was going to be damp mopped. I explained to her that if this floor is going to be any more than damp mopped, that water will ruin this floor. It is not made for that with a chemical weld. If we need water protection, we need to use [the heat welding process]. But it's also -- at the time it was $15,000 more. And she did not want to spend that kind of money, $15,000 more to do that.

Couch maintains that there has never been an "excessive" amount of water on her floor since the installation. But the evidence presented supports a conclusion that there was regularly more water than would accumulate through damp mopping alone. Melissa Martin testified that there was enough moisture on the floor during her two visits that it would squeeze through the seams when the floor was pushed on. She characterized the facility as "an area where there's lots of water on a daily basis," and explained that dog accidents, water bowls, etc., resulted in "constant mopping."[1] Based on photographs showing water damage to the walls inches above the floor, James Sharp testified that there had clearly been excessive water on the floor and that it had exceeded the amount that Couch had described.[2]

The trial court also heard evidence about third persons making repairs to the flooring. The Velvet Snout hired Snuffy Kelly to make additional repairs. The flooring problems

---

[1]  In addition to the water that accumulates on the Velvet Snout's floors through its everyday business activities, Couch testified that the building's roof leaks "[e]very time it rains."

[2]  Vernon Sharp testified--without objection--that the scope of work described in the repair estimate prepared by the Velvet Snout's expert made it clear to him that water had been getting under the floor through the cove base, which is higher than the floor.

reappeared and worsened after this work, and more repairs were made to both the floor and the adjoining walls by various other persons. The Velvet Snout's experts were unaware of this repair history. As Melissa Martin flatly explained: "I did not know of any repairs being done to the floor, no." As such, she did not know who was responsible for the shoddy sealing work she observed during her two inspections. And as James Sharp pointed out during his testimony, it was possible that Snuffy Kelly or others who worked on the floor caused further problems.

We thus conclude that the court's findings are supported by legally sufficient evidence. And because the Velvet Snout has not established that the findings are contrary to the great weight and preponderance of the evidence, it is factually sufficient as well. We overrule Issue Two and affirm the judgment of the trial court.

February 19, 2014

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.