# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50105

United States Court of Appeals
Fifth Circuit

**FILED**
August 17, 2018

Lyle W. Cayce
Clerk

IAS SERVICES GROUP, L.L.C.,

      Plaintiff - Appellant

v.

JIM BUCKLEY & ASSOCIATES, INCORPORATED; JAMES BUCKLEY, Individually, and as Co-Trustee of the Buckley Family Trust Dated 6/21/01; BARBARA BUCKLEY, Individually, and as Co-Trustee of the Buckley Family Trust dated 6/21/01,

      Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before CLEMENT, HIGGINSON, and HO, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This is a case about a business deal gone sour between two insurance-claims-adjusting firms. Looking to expand, Plaintiff-Appellant IAS expressed interest in acquiring Defendant-Appellee James Buckley & Associates. During negotiations, James Buckley, owner of Buckley & Associates, made various representations regarding the strength of his company's business—representations that IAS now contends were fraudulent. Allegedly in reliance on those representations, IAS acquired Buckley & Associates' assets and agreed to employ Buckley. Shortly thereafter, Buckley & Associates lost its

No. 17-50105

largest client, causing it, and IAS, to lose money. IAS made do for a while, but eventually fired Buckley and sued him and Buckley & Associates for, among other things, fraudulent inducement and breach of contract. Buckley countersued for breach of his employment contract with IAS. The district court dismissed IAS's fraud claim and then, after a bench trial, rendered judgment for defendants on all other claims. IAS appealed, and we affirm in part and reverse in part.

## I.

## A.

In 2010, IAS, a Texas based firm owned and operated by Larry Cochran, was looking to expand. With the help of an investment banking firm, IAS identified California-based James Buckley & Associates as a potential acquisition target. In early 2011, the two firms entered into a non-disclosure agreement in which they each agreed not to "disclose to any third party, or use the existence of this Agreement, or the nature of the transaction contemplated, in any way without the express prior written approval of the other." IAS made an initial offer to purchase Buckley & Associates about a month later, and, after some negotiations, the parties agreed to a $3.6 million purchase price, with $2.4 million due at closing and a $1.2 million note payable in five equal annual installments. They also agreed that IAS would employ James Buckley for five years at a salary of $250,000 per year. The parties memorialized those terms in a letter of intent that they signed in June. The letter of intent also included a 60-day exclusivity or "no shop" period during which Buckley & Associates would not discuss with any other person the possibility of a sale of Buckley & Associates' stock or assets.

Prior to closing, IAS did its due diligence, looking into Buckley & Associates' financial statements and customer history performance reports. IAS learned that Buckley & Associates' biggest customer, responsible for

approximately 45% of its revenues, was a large insurance company called QBE. Cochran asked if he could meet with Buckley & Associates' key clients, including QBE, but Buckley responded that such a meeting would not be appropriate and that he could "handle that better himself." Cochran did, though, review QBE's contract with Buckley & Associates and was aware that the contract did not guarantee any particular amount of business and that QBE could terminate the agreement for any reason with 45 days' notice. Cochran understood that, as is typical in the industry, the amount of business received from an insurance company depended on the strength of the loss adjuster's relationship with the company and the adjuster's rank among the company's various vendors. And on that score, Buckley painted a rosy picture. He told Cochran that Buckley & Associates was QBE's "number one" adjusting firm, outperforming QBE's eight other vendors, and represented that Buckley & Associates' revenues were likely to grow. And just days before closing, Buckley told Cochran that there was "[g]reat news" from QBE, and that recent developments with respect to a merger between QBE and another insurance company called Sterling "look very good for us."

But the reality was not so rosy. According to an internal Buckley & Associates memo created in June 2011, and shown to Buckley, Buckley & Associates was ranked eighth out of QBE's nine vendors for the first quarter of 2011. In fact, Buckley & Associates had not been ranked first in total quality among all of QBE's vendors at any time during 2010 or 2011 (although it had been ranked first at times in the past). And following its merger with Sterling, QBE was looking to consolidate its vendor panel by working with fewer, larger firms. Indeed, prior to IAS's acquisition of Buckley & Associates, QBE knew that it was not going to continue doing business with all of its current adjusting firms. It did not, however, make its consolidation plan public until December 2011.

No. 17-50105

IAS's acquisition of Buckley & Associates was finalized on October 11, 2011, when the parties executed an asset purchase agreement and Buckley and IAS entered into an employment agreement.  Pursuant to the employment agreement, IAS could terminate Buckley either for cause (including fraudulent conduct) or for reasons other than cause.  Buckley would be entitled to severance pay upon termination only if he:  (1) was terminated for reasons other than cause (or he quit for "good reason") and (2) "execute[d] and deliver[ed] to [IAS] a General Waiver & Release of Claims."

The asset purchase agreement provided for the transfer of Buckley & Associates' assets, including its contracts, to IAS.  Two of its provisions are particularly relevant to this appeal.  First, in section 2.3, Buckley and Buckley & Associates represented and warranted to IAS that:

> Neither the execution and delivery by [Buckley & Associates or Buckley] of this Agreement and the other agreements contemplated hereby, nor the performance by [Buckley & Associates or Buckley] of their respective obligations under this Agreement and such other agreements, nor the consummation by [Buckley & Associates] of the Purchase Transaction, will . . . violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any authorization, consent, approval, execution or other action by, or notice to, any third party under, any Contract or any Encumbrance to which [Buckley & Associates or Buckley] is a party or by which such Person is bound or to which any of such Person's assets are subject, provided that the Parties acknowledge that consents of the landlords under the Lease Agreements . . . to assignments of the Lease Agreements to [IAS] have not been obtained on or prior to the [effective date of the asset purchase agreement], and the Parties Shall use their commercially reasonable efforts after [that date] to obtain such consents.

Second, section 4.2 sets forth the following covenant regarding "Non-Assignable Contracts":

4

No. 17-50105

> If any consent, waiver or approval required to be made or obtained for the valid and effective assignment of any Assumed Contract by [Buckley & Associates] to [IAS] has not been obtained as of the [effective date of the asset purchase agreement], (such Assumed Contracts being the "Non-Assignable Assumed Contracts"), [Buckley & Associates and Buckley] will use their respective commercially reasonable efforts to . . . cooperate with [IAS] in arrangements designed to provide the benefits of such Non-Assignable Assumed Contract (including, without limitation, the right to receive all amounts owing to [Buckley & Associates] thereunder) to [IAS] . . . .

As is relevant here, the contract between Buckley & Associates and QBE provided that "[n]either party may assign this agreement or any of the rights hereunder or delegate any of its obligations hereunder without the prior consent of the other party." It further provided that "any such attempted assignment shall be void." Buckley did not obtain QBE's consent to assign its contract to IAS, believing that the nondisclosure agreement he had entered with IAS prevented him from disclosing the pending sale. But Cochran assumed that Buckley had obtained QBE's consent. It was not until he received a call from Buckley six days after closing that Cochran learned that QBE had not consented to assigning its contract to IAS. At that time, Buckley told Cochran that there was "a problem with . . . QBE and the assignment," but that "they weren't really giving him any answers."

About one week after the parties executed the asset purchase agreement, QBE made the decision to terminate its relationship with Buckley & Associates and, by extension, IAS. An internal QBE email explaining the decision stated that QBE was "recently made aware that IAS had purchased [Buckley & Associates]," and that "[t]his action put QBE . . . in a position of having to decide whether to bring on an additional new firm under contract or terminate the existing contract with the former [Buckley & Associates]." QBE decided to terminate, as it did not want to invest in bringing a new vendor on board.

Although it appears that the decision to terminate was triggered by IAS's acquisition of Buckley & Associates, QBE's vice president of claims did testify at trial that QBE "likely would have reached a similar outcome, just later in time," as part of its planned vendor consolidation. Two months later, in December 2011, QBE sent Buckley a letter officially giving notice of its intent to terminate the relationship. The termination was effective February 1, 2012.

Even prior to the official termination notification, IAS did not receive any new claims from QBE. Rather, IAS worked only on "tail files" that remained from claims assigned to Buckley & Associates prior to its acquisition. Buckley did bring in some new business for IAS, but, in 2012, revenue of the former Buckley & Associates was down 50% below what had been projected at the time IAS acquired it, and it dropped another 27% in 2013. Between acquisition and early 2014, IAS incurred approximately $950,000 in losses from Buckley's division.

IAS suffered other losses, too. Business was down 25 to 40% industry wide in 2012. By 2013, IAS claimed it did not have the cash on hand to make the second annual payment owed to Buckley on the $1.2 million note. IAS then terminated Buckley in early 2014, taking the position that his termination was "for cause" based on his failure to get consent to assign the QBE contract to IAS. As noted above, Buckley was entitled to severance pay only if he was terminated for reasons other than for cause and if he "execute[d] and delivere[d] to [IAS] a General Waiver & Release of Claims." While the parties dispute whether Buckley was actually terminated for cause, it is undisputed that he never delivered a release of claims to IAS. IAS never made any severance payments.

**B.**

IAS filed this suit against Buckley and Buckley & Associates in early 2014, asserting claims for fraud, fraudulent inducement, fraud by

nondisclosure, and breach of contract.  Buckley and Buckley & Associates moved to dismiss all claims and filed counterclaims alleging (among other things not relevant here) that IAS breached the employment agreement by failing to pay Buckley any severance pay.  The district court granted the motion to dismiss with respect to IAS's fraud-based claims, and the parties proceeded to a bench trial on IAS's breach-of-contract claim and Buckley and Buckley & Associates' counterclaim.  After trial, the district court adopted Buckley and Buckley & Associates' proposed findings of fact and conclusions of law and awarded them damages and attorneys' fees.  IAS timely appealed.

## II.

### A.

IAS first challenges the district court's dismissal of its fraudulent-inducement claim.  We review a dismissal for failure to state a claim de novo, accepting all well-pleaded facts as true and viewing them in the light most favorable to the plaintiff.  *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  "[R]eview is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).  Under Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure, to state a claim for fraud, a plaintiff must plausibly plead facts establishing "the time, place and contents of the false representation[], as well as the identity of the person making the misrepresentation and what that person obtained thereby."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009) (quoting *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999)).

"Fraudulent inducement 'is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of

its proof.'" *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012) (quoting *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)). To state a claim for fraudulent inducement, a plaintiff must plausibly plead facts establishing that: "(1) the other party made a material misrepresentation, (2) the representation was false and was either known to be false when made or was made without knowledge of the truth, (3) the representation was intended to be and was relied upon by the injured party, and (4) the injury complained of was caused by the reliance." *Int'l Bus. Machs. Corp. v. Lufkin Indus., Inc.*, No. 12-15-00223-CV,  -- S.W.3d --, 2017 WL 2962836, at *4 (Tex. App.—Tyler July 12, 2017, pet. filed), *supplemented*, No. 12-15-00223-CV, 2017 WL 3499951 (Tex. App.—Tyler Aug. 16, 2017, no pet.). On appeal, IAS identifies three alleged misrepresentations that it contends led it to enter into the asset purchase agreement: (1) Buckley's statement that Buckley & Associates was QBE's "number one" vendor; (2) Buckley's statement that Buckley & Associates' revenue from QBE would continue to grow; and (3) the statement in § 2.3 of the purchase agreement that its execution would not "violate, conflict, [or] result in a breach of . . . any Contract . . . to which [Buckley & Associates] is a party." We address each in turn and reverse the district court's dismissal.

**1.**

The district court held that IAS failed to adequately plead (1) when and where the "number one" vendor statement was made, as required under Rule 9(b), and (2) that IAS relied on the statement in entering the asset purchase agreement. We disagree on both points.

To the first point, Rule 9(b) does require that fraud be pleaded with "particularity." Fed. R. Civ. P. 9(b). But "9(b)'s ultimate meaning is context-specific." *Grubbs*, 565 F.3d at 188 (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)); *accord Benchmark Elecs., Inc. v. J.M. Huber, Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) ("What constitutes 'particularity' will

necessarily differ with the facts of each case . . . ." (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992))).  And we are mindful that Rule 9(b) "does not supplant Rule 8(a)'s notice pleading," *Grubbs*, 565 F.3d at 186, which requires "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Rather, Rule 9(b) "supplements" Rule 8(a), *Grubbs*, 565 F.3d at 186, in order to "provide[] defendants with fair notice of the plaintiffs' claims, protect[] defendants from harm to their reputation and goodwill, reduce[] the number of strike suits, and prevent[] plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).

Here, the complaint alleges that, during the 60-day no-shop period that began with the execution of the parties' letter of intent on June 21, 2011, "Buckley represented to the President of IAS, Larry Cochran, that [Buckley & Associates] was QBE's 'number one' adjusting firm."  Under the circumstances, the allegations are sufficiently particular to "state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, and to satisfy Rule 9(b)'s purpose of weeding out strike suits and fishing expeditions.  As we explained in *Grubbs*, Rule 9(b)'s particularity requirements are tied to the elements of fraud, specifically detrimental reliance, *see* 565 F.3d at 188–89; without sufficient detail regarding the alleged misrepresentation, no plaintiff could plausibly plead that he or she actually relied on it.  Here, the timing and content of the alleged misrepresentation support an inference of reliance; the complaint alleges that the "number one" vendor statement was made during the time in which the purchase agreement was being finalized and just months before it was executed.

As to reliance, the complaint's allegations are also sufficient.  The complaint alleged that "[t]he principal component of the value of an insurance

adjusting business is the revenue generated by the customer contracts"; that Buckley & Associates' biggest customer was QBE, which was responsible for 45.3% of its revenues; that Buckley misrepresented that Buckley & Associates was ranked first among QBE's vendors; and that IAS relied on that representation when conducting its "financial analysis and pricing model for [Buckley & Associates]." Those allegations are susceptible to the reasonable inference that IAS relied on the statement that Buckley & Associates was QBE's top-rated vendor when forecasting the likely volume of claims QBE would send to Buckley & Associates and thus the value of Buckley & Associates' assets. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that a claim to relief is plausible when a court can "draw the reasonable inference that the defendant is liable" from the facts alleged).

The district court also relied on *Bohnsack v. Varco, L.P.*, 668 F.3d 262 (5th Cir. 2012), to conclude that the complaint failed to adequately plead that the "number one" vendor statement was material to IAS's decision to enter into a contract with Buckley & Associates, rather than simply a statement to encourage negotiations. But that reliance was misplaced. In *Bohnsack*, we held that, under Texas law, "[f]alse statements that build a plaintiff's trust during negotiations but are not a 'material factor' in his decision to enter into a contract cannot form the basis for a fraudulent inducement claim." *Id.* at 278. But there, a two-year gap separated the alleged misrepresentation from plaintiff's decision to enter into a contract with the defendant. And the nature of the alleged misrepresentation was such that, while it might have built trust between the parties for purposes of facilitating negotiations, it made the plaintiff *less* likely to enter into a contract than would have the truth.[1] *Id.* at

---

[1] Furthermore, *Bohnsack* was an appeal from the denial of judgment as a matter of law, so we were asked to assess the sufficiency of the evidence rather than of the pleadings. *See* 668 F.3d at 266, 279.

278. Here, by contrast, the alleged misrepresentation was relevant to the "principal" input regarding the value of Buckley & Associates' assets and was made within a few months of the execution of the asset purchase agreement. Under the circumstances, the "number one" vendor statement is the kind of statement that "a reasonable person would attach importance to and would be induced to act on." *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 478–79 (Tex. App.—Fort Worth 2004, no pet.) (defining "material information").

Finally, defendants argue that the complaint failed to allege with sufficient particularity how Buckley knew that the alleged misrepresentation was false. But the complaint specifically alleged that Buckley made the "number one" vendor representation sometime after June 21, 2011, despite an internal Buckley & Associates document dated June 2, 2011, indicating that the company was ranked eighth out of nine vendors. Those facts are sufficient for the reasonable inference that Buckley either knew that the statement was false or made it recklessly with regard to its truth. The complaint adequately pleaded that the "number one" vendor statement fraudulently induced IAS to enter into the asset purchase agreement.

**2.**

IAS also contends that Buckley fraudulently induced it to enter the asset purchase agreement by misrepresenting that Buckley & Associates' business with QBE was "likely to grow" and "would continue to grow." "Because '[a] prediction, or statement about the future, is essentially an expression of opinion,' future predictions are generally not actionable." *Hoffman v. L & M Arts*, 838 F.3d 568, 579 (5th Cir. 2016) (quoting *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986)) (applying Texas law). But "[i]n rare cases, a prediction of future events can be 'so intertwined with' 'direct representations of present facts' as to be actionable." *Id.* (quoting

*Trenholm v. Ratcliff*, 646 S.W.2d 927, 931 (Tex. 1983)).  In *Trenholm*, for example, a land developer's prediction that a nearby trailer park would soon shut down and move was actionable because it was intertwined with false representations of present fact—namely that the park had been sold and notices given to its tenants.  *Trenholm*, 646 S.W.2d at 930–31.

Viewing the facts as alleged in the light most favorable to IAS, Buckley said business with QBE "would continue to grow" in connection with his statement that Buckley & Associates was QBE's "number one" vendor.[2]  The reasonable implication was that business would continue to grow *because* Buckley & Associates was ranked first.  As in *Trenholm*, the "representation was not merely an expression of an opinion" that growth would continue, but was intertwined with the alleged factual misrepresentation of Buckley & Associates' rank among QBE's vendors.  *Id.* at 930–31.  Accordingly, "the whole statement amounts to a representation of facts" and is therefore actionable. *Id.* at 931.

**3.**

The district court also held that IAS failed to state a claim for fraudulent inducement based on the representations in § 2.3 of the asset purchase agreement.  We disagree.  In pertinent part, § 2.3 states that execution of the agreement will not "violate, conflict with, [or] result in a breach of . . . any Contract" to which Buckley and Buckley & Associates are parties.  But, as alleged in the complaint, Buckley & Associates' contract with QBE required Buckley & Associates to obtain QBE's consent prior to assigning that contract to any other party.  Nonetheless, defendants closed on the transaction, thereby assigning Buckley & Associates' contract with QBE to IAS, without attempting

---

[2] Specifically, the complaint alleges that Buckley misrepresented that Buckley & Associates "was QBE's 'number one' adjusting firm and that business would continue to grow."

to obtain QBE's consent.  Accordingly, the complaint plausibly alleged that §
2.3 was a material misrepresentation, falsely asserting that execution of the
asset purchase agreement would not result in a conflict with or breach of any
other contract, despite defendants' failure to obtain QBE's consent to
assignment as required under QBE's contract with Buckley & Associates.  The
complaint also plausibly alleged reliance.  It alleged that a large proportion of
the value of Buckley & Associates came from its contract with QBE, and that
IAS would not have acquired Buckley & Associates' assets had it known that
QBE had not consented to the assignment of its contract to IAS.

The district court, however, held that IAS failed to establish justifiable
reliance based on a dispute regarding the meaning of § 4.2 of the asset
purchase agreement.  Section 4.2 provides that, if any consent required to be
obtained "for the valid and effective assignment" of any contract is not obtained
prior to execution of the purchase agreement, then Buckley and Buckley &
Associates "will use their respective commercially reasonable efforts to . . .
cooperate with [IAS] in arrangements designed to provide the benefit" of any
contracts rendered non-assignable due to the failure to obtain consent.  IAS
argued, then as now, that § 4.2 simply operates like a contracted-for remedy,
setting out defendants' obligations in the event of a failure to obtain consent
without undermining the reliability of the representation made in § 2.3.  But
the district court concluded that § 4.2 "disclaimed reliance on all contracts
being assignable," and that, "[b]ecause it was not clear that [§§] 2.3 and 4.2
operate the way in which plaintiff contends," § 4.2 created a "red flag"
indicating that reliance on § 2.3 was unwarranted.

"It is well-established that '[t]he recipient of a fraudulent
misrepresentation is not justified in relying upon its truth if he knows that it
is false or its falsity is obvious to him.'"  *Nat'l Prop. Holdings, L.P. v.
Westergren*, 453 S.W.3d 419, 424 (Tex. 2015) (quoting Restatement (Second) of

Torts § 541 (1977)). Accordingly, under Texas law, "a person may not justifiably rely on a representation if 'there are "red flags" indicating such reliance is unwarranted.'" *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)). But "[t]he issue of justifiable reliance is generally a question of fact." *Jacked Up, LLC v. Sara Lee Corp.*, 854 F.3d 797, 811 (5th Cir. 2017) (quoting *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 584 (Tex. App.—San Antonio 2011, no pet.); *accord 1001 McKinney Ltd. v. Credit Suisse First Bos. Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("[C]ourts have uniformly treated the issue of justifiable reliance as a question for the factfinder."). And for good reason. Justifiable reliance is a fact-intensive inquiry, asking "whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'" *Grant Thornton LLP*, 314 S.W.3d at 923 (quoting *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990)).

Under some circumstances, disclaimers such as waiver-of-reliance or negation-of-warranty provisions in contracts can preclude justifiable reliance on contrary statements. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 180–81 (Tex. 1997). However, such language must be unequivocal to bar a claim of fraudulent inducement. *Id.* at 181 (holding that "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement"); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011) (explaining that, to disclaim reliance on any misrepresentations, contract must "do so by clear and unequivocal language"). And even then, circumstances

matter.  The Texas Supreme Court has "especially reject[ed] the notion that the mere use of [a] negation-of-warranty and no-recourse provision . . . could wholly negate justifiable reliance." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 655–56 (Tex. 2018).  Rather, courts "must view the circumstances in their entirety." *Id.* at 656.

Here, circumstances aside, there is no unequivocal disclaimer. Whether an adequate disclaimer of reliance exists is a matter of law, subject to "well-established rules of contract interpretation." *Schlumberger Tech.*, 959 S.W.2d at 179; *see also Italian Cowboy Partners*, 341 S.W.3d at 333.  If the contract is subject to two or more reasonable interpretations, then "the contract is ambiguous, creating a fact issue on the parties' intent." *Italian Cowboy Partners*, 341 S.W.3d at 333 (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)).  As the district court all but recognized by concluding that "it was not clear that §§ 2.3 and 4.2 operate the way in which plaintiff contends," it is ambiguous to say the least whether § 4.2 disclaims reliance on § 2.3.  Accordingly, §4.2 is not the kind of unequivocal statement that can disclaim reliance or create a red flag as a matter of law, and dismissal on that basis was not warranted.

**4.**

Finally, defendants contend that remand for further litigation of IAS's fraudulent inducement claim is unnecessary because the district court already heard and rejected IAS's fraud evidence.  At trial, Buckley pressed a counterclaim against IAS, arguing that IAS was liable for paying him $250,000 in severance pay.  In defense, IAS presented evidence of Buckley's alleged fraudulent misrepresentations, arguing that they constituted cause for termination under the employment agreement and therefore precluded severance pay.  In adopting defendants' findings of fact and conclusions of law, the district court concluded that "there was no fraud" committed by Buckley

and therefore "no valid basis for IAS to terminate [him] 'for cause'" under the terms of the employment agreement.

But we are not persuaded that the district court's order precludes remand for further litigation of IAS's fraud claims. The district court's conclusion that "there was no fraud" does not appear to be have been based on any assessment of the evidence presented at trial. Rather, the district court noted that "IAS's fraud allegations ha[d] been dismissed," and then concluded on that basis that "there was no fraud." Because we reverse the dismissal of IAS's fraudulent inducement claim, we remand for further proceedings.

**B.**

IAS next contends that the district court erred by entering judgment, after a bench trial, against it on its breach-of-contract claim. It argues that Buckley and Buckley & Associates breached § 2.3 of the asset purchase agreement by executing the agreement without first having obtained QBE's consent to assignment. The district court disagreed, concluding that Buckley and Buckley & Associates had no contractual duty to obtain QBE's consent prior to closing on the purchase agreement and finding that, in any event, the failure to obtain QBE's consent did not cause IAS cognizable contract damages. Because we agree on the second point and affirm, we need not address the first.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issue are reviewed *de novo*." *Lehmann v. GE Global Ins. Holding Corp.*, 524 F.3d 621, 624 (5th Cir. 2008) (quoting *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)). A finding is clearly erroneous if, after viewing the evidence in its entirety, we are "left with the definite and firm conviction that a mistake has been committed." *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258–59 (5th Cir. 2006) (quoting *Walker v. Braus*, 995 F.2d 77, 80 (5th Cir. 1993)). We may

not reverse a finding that is "plausible in light of the record viewed as a whole" simply because we "would have weighed the evidence differently." *Id.* at 258.

"The elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Walker v. Presidium, Inc.*, 296 S.W.3d 687, 693 (Tex. App.—El Paso 2009, no pet.). The final element requires causation. *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.). To recover on a breach-of-contract claim, "the evidence must show that the damages are the 'natural, probable, and foreseeable consequence' of the defendant's conduct." *Id.* (quoting *Prudential Sec., Inc. v. Haugland*, 973 S.W.2d 394, 396–97 (Tex. App.—El Paso 1998, pet. denied).

Here, the district court's finding was not clearly erroneous. There was evidence presented at trial that QBE's decision to terminate its relationship with Buckley & Associates—and, by extension, IAS—was primarily the result of QBE's internal restructuring rather than Buckley's failure to obtain its consent prior to the assignment. For example, QBE's vice president of claims testified that QBE terminated its relationship with Buckley & Associates "because of [QBE's] decision to consolidate firms." He also testified that QBE likely would have terminated its relationship with Buckley & Associates for that reason regardless of IAS's acquisition of Buckley & Associates and any attendant failure to obtain QBE's consent. And he testified that QBE likely would not have consented to the assignment of its contract with Buckley & Associates to IAS even if notified earlier, reinforcing the conclusion that its decision to terminate its relationship with Buckley & Associates was caused by its desire to work with fewer vendors, and vendors with whom it already had an established relationship, and not because of Buckley's failure to obtain its consent. Finally, there was evidence that QBE's contract with Buckley &

Associates did not guarantee any particular amount of business and that QBE could terminate the contract for any reason. In sum, the district court's finding that IAS did not suffer any damages as a result of any alleged breach of § 2.3 of the asset purchase agreement is plausible in light of the record as a whole and therefore not clearly erroneous.

## C.

Finally, IAS challenges the district court's award to Buckley of approximately $300,000 in severance pay. It contends that, under its employment agreement with Buckley, he was only entitled to severance pay if he (1) was terminated for reasons other than cause and (2) executed a waiver and release of claims. It contends that neither condition was satisfied and that Buckley is therefore not entitled to severance pay. It is undisputed that Buckley did not execute the required waiver and release. Buckley argues that he is nonetheless entitled to severance pay. We disagree.

Even assuming that Buckley was terminated for reasons other than cause, he failed to satisfy the second condition precedent to his receipt of severance pay: execution of the required release and waiver. The employment agreement states that "[a]s a condition to the Employee's entitlement to receive each and every installment of the Severance Payment, the Employee must execute and deliver to the Employer a General Waiver & Release of Claims," a copy of which was attached to the employment agreement. Buckley contends that the failure to perform a condition precedent is an affirmative defense that IAS has waived by not pleading, but Texas law "expressly requires the party asserting breach to prove that a condition precedent is satisfied." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 412 n.19 (5th Cir. 2009) (citing *Associated*

No. 17-50105

*Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998)).[3] Buckley alternatively argues that he was excused from satisfying the condition precedent because doing so would have been futile. His point appears to be that he should not have been required to release his claims against IAS—specifically his claim that IAS wrongfully withheld severance pay—when IAS would nonetheless refuse to pay based on its position that he had been terminated for cause. But the waiver and release itself belies Buckley's argument. It explicitly excludes claims "arising under or pursuant to . . . the Asset Purchase Agreement," to which Buckley's employment agreement was attached as an exhibit, and states that Buckley retains claims related to his "right to receive the compensation specified in Section 6 of the Agreement," which contains the provisions pertaining to severance pay. Buckley therefore could have completed the required waiver and release and still pursued his claim for severance pay. Accordingly, we vacate the district court's award of severance pay to Buckley.

### III.

For the foregoing reasons, we REVERSE the dismissal of IAS's fraudulent-inducement claim, AFFIRM the judgment in favor of defendants on IAS's breach-of-contract claim, and VACATE the award of $296,091.72 in

---

[3] "In a diversity case, substantive state law determines what constitutes an affirmative defense." *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014). While the employment agreement states that it is governed by California law, Buckley cites only Texas law in support of his argument. In any event, the satisfaction of a condition precedent is an affirmative part of a plaintiff's claim for breach of contract under California law, too. *See Alki Partners, LP v. DB Fund Servs., LLC*, 209 Cal. Rptr. 3d 151, 164 (Cal. Ct. App. 2016) ("A party's failure to perform a condition precedent will preclude an action for breach of contract."); *Health Net, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, No. B262716, 2016 WL 5845753, at *15 (Cal. Ct. App. Oct. 6, 2016) (listing "performance of, or excuse from, conditions precedent to the defendant's obligations" as an element of a breach-of-contract claim); *see also Occurrence of Agreed Condition Precedent*, Judicial Council of Cal. Civil Jury Instruction 322 (2018) (placing burden on plaintiff to prove that condition precedent has been satisfied).

severance pay in favor of James Buckley.    We REMAND for further proceedings consistent with this opinion.

JAMES C. HO, Circuit Judge, dissenting in part:

I disagree with the majority's opinion insofar as it reverses the district court's dismissal of IAS's fraudulent inducement claim.

"[F]raudulent inducement claims require plaintiff to prove a misrepresentation" and, among other things, "that defendant *knew* the representation was false and intended to induce plaintiff to enter into the contract through that misrepresentation." *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012) (emphasis added). In my view, IAS has not pled its allegations with sufficient particularity. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

First, Buckley's statement that JBA was QBE's "number one" vendor lacks sufficient context to be actionable. As we have previously observed: "A representation of fact can constitute actionable fraudulent inducement only if it (1) admits of being adjudged true or false in a way that (2) *admits of empirical verification*." *Hoffman v. L & M Arts*, 838 F.3d 568, 579 (5th Cir. 2016) (emphasis added, citation and quotations omitted).

IAS has not pleaded exactly what Buckley's "number one" statement was intended to communicate. Perhaps the metric Buckley was employing was something quite different from the "internal ranking" the majority invokes (the range of possibilities include total dollars spent, number of claims processed, quality or speed of service, client satisfaction, or yet some other metric). We do not know, and IAS does not tell us—it provides no explanation of any kind anywhere in its complaint. Accordingly, IAS has failed to plead with particularity that Buckley did indeed make a misrepresentation. *See, e.g.*, *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 388 (5th Cir. 2010) (fraud claimants "must successfully allege . . . that the

representations were false when made"); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) ("[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, *and explain why the statements were fraudulent.*") (emphasis added).

Second, IAS failed to plead that JBA's representations in the Asset Purchase Agreement were fraudulent.  ¶2.3 of the Asset Purchase Agreement provides that

> Neither the execution and delivery by the Seller, the Owner, or the Beneficial Owners of this Agreement and the other agreements contemplated hereby, nor the performance by the Seller, the Owner or the Beneficial Owners of their respective obligations under this agreement and such other agreements, nor the consummation by the Seller of the Purchase Transaction, will (a) violate or conflict with any provision of the Articles of Incorporation or Bylaws of the Seller, (b) violate any Law, Order, or other restriction to which the Seller, the Owner or the Beneficial Owners is subject, (c) require the Seller, the Owner or the Beneficial Owners to make any declaration to or registration or filing with, or obtain any consent or Permit from, any Governmental Authority, (d) result in any loss of any Permit related to the Business or (e) violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any authorization, consent, approval, execution or other action by, or notice to, any third party under, any Contract or any Encumbrance to which the Seller, the Owner or the Beneficial Owners is a party or by which such Person is bound or to which any of such Person's assets are subject, provided that the Parties acknowledge that consents of the landlords under the Lease Agreements (as defined in Section 1.5(b)(v)) to assignments of the Lease Agreements to Buyer have not been obtained on or prior to the Effective Time, and the Parties shall use their commercially reasonable efforts after the Effective Time to obtain such consents.

As relevant here, ¶2.3 of the Agreement promised that "the consummation [] of the Purchase Transaction" did not "require" the "consent" of QBE (or anyone else)—and that the acquisition would not "violate, conflict with, [or] result in a breach of" JBA's contract with QBE (or anyone else).

JBA complied with this promise:  JBA did not need QBE's consent for JBA to be acquired by IAS.  Nor did the acquisition result in any breach or conflict with JBA's contract with QBE.

IAS is simply mistaken when it claims that ¶2.3 promises that *all consents to assignment of third-party contracts*—such as the JBA-QBE contract—had been obtained.  Rather, ¶2.3 states only that no third party consent was required *for IAS to purchase JBA*.

To be sure, IAS is emphatic that the ability to maintain QBE's business was a central reason for its desire to acquire JBA in the first place.  Put another way, QBE's consent to assignment of its contract with JBA was undoubtedly necessary to fulfill IAS's *ambitions* for the Purchase Transaction.  But ¶2.3 does not promise that "the consummation of IAS's *ambitions* for the purchase transaction" would not require QBE's consent.

Nor did the acquisition result in any breach or conflict with JBA's contract with QBE.  To be sure, consummation of the acquisition gave QBE the contractual right not to continue doing business with JBA.  But that is not a breach or violation of JBA's contract with QBE.  To the contrary, QBE always possessed the right to stop sending contracts to JBA at any time—the change of corporate ownership created no right that QBE did not already possess.

The bottom line is this:  JBA never warranted that it had obtained QBE's consent to the JBA-IAS sale, because QBE's consent wasn't actually required for JBA to sell to IAS.  QBE's consent was only required for reassignment of the contracts—the contracts IAS aspired to obtain by purchasing JBA.  And

nothing in ¶2.3 purports to represent that JBA made all the arrangements necessary for reassignment of the QBE contracts.

Hence, ¶2.3 was not a misrepresentation and could not have supported IAS's fraudulent inducement claim.

I concur in the majority's resolution of the remaining issues.