**Opinion filed May 9, 2024**



## In The

# Eleventh Court of Appeals

_____

### No. 11-22-00230-CV

_____

**LARIO OIL & GAS COMPANY, Appellant**

**V.**

**BLACK HAWK ENERGY SERVICES, LTD. AND STEEL ENERGY SERVICES, LTD.,[1] Appellees**

————and————

**BLACK HAWK ENERGY SERVICES, LTD., Cross-Appellant**

**V.**

**LARIO OIL & GAS COMPANY, Cross-Appellee**

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV54669**

---

[1]Steel Energy Services, Ltd. was dismissed from the case following the trial court's grant of a directed verdict on all issues related to Steel Energy. On appeal, Lario does not contest the trial court's grant of a directed verdict in favor of Steel Energy.

**O P I N I O N**

In this breach-of-contract case, Appellant, Lario Oil & Gas Company, challenges a jury award of "$0.00" in damages where downhole oilfield pipe separated, pipe and equipment fell into the well, and an expensive "fishing" operation was required to retrieve them. Lario additionally appeals the counterclaim award in favor of Appellee, Black Hawk Energy Services, Ltd., for disputed and unpaid invoices. Lario claims that Black Hawk breached their Master Service Agreement (MSA) first, and that Lario did not thereafter breach the contract because a "bona fide dispute" existed, which contractually excused Lario's payment of Black Hawk's invoices. Black Hawk has filed a conditional cross-appeal, alleging that, within the terms of the MSA, Lario released Black Hawk from all claims arising out of or related to property damages—which encompassed all of Lario's alleged damages.

Because we conclude that the jury award of "$0.00" in damages to Lario is neither arbitrary nor against the great weight and preponderance of the evidence, and that the jury could have fairly and reasonably determined that no bona fide dispute existed that could excuse Lario's nonpayment of the invoices, we affirm the judgment of the trial court.

*Factual and Procedural History*

In December 2016, Lario and Black Hawk entered into an MSA to govern the scope of all future work together. Some months later, Lario hired Black Hawk to perform a workover job on the Peggy 101 Well—a routine electric submersible pump (ESP) pull. The purpose of the workover job was to pull and replace an ESP. When there are no complications, a typical workover job can be completed within three to five days. Black Hawk, as the contractor for the job, was responsible for hiring their own crew, managing the crew, and providing the necessary equipment for the workover job.

2

Black Hawk began the workover job on May 8, 2017. That day, there were challenges with "killing" the well—or neutralizing the downhole pressure of the well to make it safe to perform the contracted work. The next day, after the well had been "killed," Michael Serrano, the tool pusher for Black Hawk, performed a function test for the blowout preventer (BOP). Following a successful test of the BOP, the Black Hawk team on site met with the Lario "company man," Mark Cochran, for a safety meeting.

Cochran told Serrano and the Black Hawk team that hydrogen sulfide gas (H2S) was possibly present in the well, and that it could cause pipe corrosion, meaning that the Black Hawk team was to look for "bad pipe" or holes in the pipe—also commonly referred to as "tubing." As Black Hawk was pulling the pipe, they discovered pinholes in the 94th and 114th pipe joints. Each time that the crew discovered pinholes in a joint of pipe, Black Hawk informed Cochran, the joint was pulled, and the crew then resumed pulling joints of pipe out of the well. The string of tubing parted at the 116th joint, causing the ESP to break, the joint to separate, and the ESP and pipe to fall into the hole.

The well workover was shut down that day after the incident. Ismael Garcia, a safety coordinator for Black Hawk at the time of the incident, indicated that when an incident occurs, the regular procedure is to have an investigation into the incident—which includes drug testing for the Black Hawk employees involved. The employees took drug tests that day and returned to work the next day, pending the results of the drug tests. The Black Hawk crew was informed that if an employee were to test positive on the "instant" test, they were to be placed on leave until the lab results were returned, and, if the latter result was also positive, their employment termination would be backdated to the date of the instant positive test. In this case, three of the eight Black Hawk employees involved tested positive for cocaine and were terminated.

Following the incident, Lario hired Kenneth Young, a consultant experienced in "fishing" pipe and equipment out of wellbores. Young was employed with Key Energy at that time, was well-known for his fishing job experience, and had worked with Cochran and Lario previously. Young first worked with the original Black Hawk crew. He described them as nervous and a "little jittery." After approximately one week, a new Black Hawk crew started and Young felt that the new team did an "excellent job" and had "very, very good knowledgeable hands." The Black Hawk team continued working on the fishing operation until September 2017, and Young testified that he would have been happy to work with them until the completion of the project in March 2018.

During the time that Black Hawk worked on the original workover project and the fishing operation, Cochran—or another Lario representative—signed daily work logs for the work completed by Black Hawk. These work logs were then submitted to Lario with an invoice. There were seven different invoices from May 2017 to September 2017. The total for all seven invoices amounted to $825,292.49. Lario refused to pay the invoices, claiming that Black Hawk had caused the incident and the fishing work to be done, thereby creating an alleged "bona fide dispute" under the terms of the MSA.

At trial, there was testimony presented that, those joints of pipe retrieved from the hole that had developed pinholes would have been removed from the well's string of tubing, even if the pipe had not failed, because those joints had been compromised. Black Hawk's forensic and petroleum engineering expert witness, David Watson, testified that there had been extreme corrosion inside the tubing (pipe) compromising the integrity and strength of the string of pipe and thread connections. According to Watson, the corrosion caused the separation of the pipe that was involved in the incident and the subsequent "fishing" operation. Watson

4

additionally testified that the BOP did not cause or contribute to the separation of the pipe or the damage to the pipe.

Jury question Nos. 1–4 and the jury's answers to those questions are the source of the legal contentions between the parties on appeal. They were worded as follows:

Question 1: Did Black Hawk fail to comply with the MSA?

Answer: "Yes."

Question 2: Did Black Hawk fail to comply with any warranty or representation expressed in the MSA, and was that failure a proximate cause of Lario's damages? (The definition of "proximate cause" was provided.)

Answer: "Yes."

Question No. 3: What sum of money, if paid now in cash, would fairly and reasonably compensate Lario for its damages that resulted from Black Hawk's failure to comply with the MSA?

Consider the following elements of damages, if any, and none other:

The reasonable and necessary cost to finish the uncompleted work. Answer in dollars and cents, if any. Do not add any amount for interest on damages, if any.

Answer: "$0.00"

Question No. 4: Did the negligence of Black Hawk proximately cause the damage to Lario's Property in question? (The definitions of "negligence," "ordinary care" and "proximate cause" were provided). Answer "Yes" or "No."

ANSWER: "No."

Following the presentation of evidence, a jury rendered a verdict in favor of Black Hawk and against Lario. The judgment signed by the trial court ordered that Lario take nothing from Black Hawk or Steel, and that Black Hawk recover actual damages in the amount of $825,292.49; prejudgment interest on actual damages awarded in the amount of $157,837.19; reasonable and necessary attorney's fees in the amount of $74,425.00; court costs as provided by law; and post-judgment interest

5

at the rate of 5% per annum, compounded annually on the sum $983,129.68 from the date of judgment until paid. This appeal by Lario followed, and Black Hawk filed a conditional cross-appeal. We first address Lario's issues on appeal.

*Issues One and Two: Legal and Factual Sufficiency*

Lario's first and second issues on appeal are related. First, Lario makes a *legal* sufficiency challenge, arguing that the jury's award of "$0.00" was arbitrary, because the jury found that Black Hawk failed to comply with the MSA and that Black Hawk's breaches of the MSA "proximately caused" Lario damages. Second, Lario makes an alternative *factual* sufficiency challenge, arguing that the jury's award of $0.00 was against the great weight and preponderance of the evidence because there was objective and undisputed evidence of economic injury to Lario. We address each in turn.

A. *Legal Sufficiency*

Under a legal sufficiency review, we consider all of the evidence in the light most favorable to the prevailing party, make every reasonable inference in that party's favor, and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 822, 827 (Tex. 2005). "When a party attacks the legal sufficiency of an adverse finding on an issue on which it bears the burden of proof, the judgment must be sustained unless the record conclusively establishes all vital facts in support of the issue." *Shields Ltd.* P'Ship v. *Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017) (citing *Mo. Pac. R. Co. v. Limmer*, 299 S.W.3d 78, 84 n.30 (Tex. 2009); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam)). To "conclusively establish" the contested fact on which it bears the burden of proof, the evidence must leave "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex. 1982). We cannot substitute

6

our judgment for that of the factfinder if the evidence falls within this zone of reasonable disagreement. *City of Keller*, 168 S.W.3d at 822.

In addressing Lario's challenge to the jury's zero-damages finding in answer to jury question No. 3, we must distinguish "uncertainty as to the *fact* of damages" from "uncertainty merely as to the *amount* of damages." *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019) (*IBM*) (emphasis added) (quoting *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex. 1985)). Lario argues that the evidence conclusively established the amount of its claimed damages, but its legal challenge to the jury's zero-damages finding rests on an assertion that the evidence conclusively established that Lario suffered *some* damages—some amount more than zero—as a result of Black Hawk's breach. Because Lario bore the burden of proof on that issue, it must demonstrate on appeal that the evidence conclusively established the fact of damages as a matter of law. *See Dow Chem.*, 46 S.W.3d at 241. To conclusively establish that fact, the evidence must leave "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Triton Oil*, 644 S.W.2d at 446.

Lario argues that it meets this burden on appeal because the evidence conclusively established—as the jury found—that Black Hawk breached the MSA and that Black Hawk's breach was the proximate cause for the damages suffered by Lario. Thus, Lario claims that the evidence is legally insufficient to support a damages award of $0.00 based on the jury's findings. Specifically, Lario contends that the testimony of Adam Strunk, Lario's Vice President of Engineering, and supporting documents, established the amount of the invoices for all work performed on the Peggy 101 Well—$6.816 million. Lario additionally points to testimony from Cochran and Young, which detailed the complexity and financial expense of the fishing project. Lario claims that there was no contrary evidence offered with respect to their claimed damages, and that an award of $0.00 damages was outside

7

the range of the damage evidence presented at trial. Despite this claim, the record reflects that Black Hawk's attorneys elicited testimony from Strunk that indicated Lario was seeking damages for bills submitted by Black Hawk—but not paid by Lario—and other testimony which indicated Strunk did not know if other invoices had yet been paid.

Black Hawk points out that while the jury may have determined that Lario suffered *some sort* of damages based on their answer to question No. 2, because of the *language* in question No. 3, those damages were simply not included in the *reasonable and necessary cost to finish the uncompleted work.* We agree that the wording of and answers to jury question Nos. 1–3—issues on which Lario had the burden of proof—do not support Lario's argument.

### 1. *Preserving the Issue of Conflicting Jury Answers*

Black Hawk argues that Lario is making a conflicting jury answer argument when it complains, on appeal, that a zero-damages finding by the jury in answer to question No. 3 is not consistent with the jury's answers to question Nos. 1 and 2. We conclude that Lario did not preserve this complaint for our review because it did not object to the jury's verdict before the jury was discharged. "[A] party who claims that jury answers fatally conflict must raise that objection with the trial court before the court discharges the jury, so that the court can correct the error by providing additional instructions and retiring the jury for further deliberations." *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 787–88 (Tex. 2021); *see USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 509 (Tex. 2018) (where, in cases of fatally conflicting jury answers, error must be preserved by objection before the jury is released). This is so, because the trial court must be allowed to correct the error by providing additional instructions and retiring the jury for further deliberations. *See* TEX. R. CIV. P. 295. Because Lario did not object to the jury's alleged conflicting answers in the trial court, "it cannot now complain [on appeal]

that the conflicting answers undermine the judgment based on the jury's verdict." *Los Compadres*, 622 S.W.3d at 787–88.

### 2. *Review of the Jury Questions and Answers*

Lario argues that the jury's answer to question No. 3 was against the great weight and preponderance of the evidence because the jury answered questions Nos. 1 and 2 in the affirmative. By that argument, Lario implies that the subject of inquiry in question Nos. 1–3 exactly coincide. But Lario alleged multiple breaches. For example, in its motion for new trial, the alleged breaches of the MSA warranties and representations upon which Lario asserted included: that services would be performed in a good and workmanlike manner; failing to complete work with reasonable diligence; failing to provide competent supervision; failing to inspect and provide safe proper equipment; failing to maintain and inspect equipment to ensure safe operation; failing to ensure that personnel entering the jobsite do not do so under the influence of drugs or alcohol; and failing to comply with federal and state laws and Black Hawk's own policies. But the focus of Lario's evidence and argument at trial, however, was limited to (1) the three positive cocaine testing results, (2) the lack of documented crew training, and (3) the possibility of issues with Black Hawk's equipment.

Because the questions were submitted in a broad-form, it is impossible to know to which contractual obligation that the jury was referring to in its answers to any of the three broadly-worded questions. The jury may have referred to different alleged breaches in formulating its answers to question Nos. 1 and 2. But there is at least one obvious and reasonable scenario that, if believed by the jury, makes its answers to question Nos. 1–3 consistent. Lario presented evidence that three of the

9

original Black Hawk crew members tested positive for cocaine after the incident.[2] For the sake of illustration, we will assume that in answering question No. 1, the jury's affirmative answer was with regard to the crew's use of drugs, which violated the MSA, but that the jury believed Black Hawk's expert when he testified that the cause of the pipe separation and consequent fishing damages was due *only* to corrosion. Unlike the cases cited by Lario, in the matter before us, there is evidence that, if believed, would support a jury finding that no damages resulted from breach. In fact, Lario never concretely connected the crew's use of drugs to *how* the downhole pipe separated, other than to broadly argue that three crew members tested positive for cocaine and that Black Hawk "controlled everything" on May 9, so "common sense probably says they're responsible" for the pipe allegedly "part[ing] against the BOP." Given the wording of the questions presented to the jury, it is possible that the jury acknowledged in its verdict that the use of drugs on the site was a violation of the MSA, but then also concluded that the drug use did not cause the loss or result in the damages that Lario was claiming.[3]

Importantly, on their face, the terms used in question No. 2 differ from the others. Conversely, the answers to question Nos. 1 and 3 correspond because they use the same language "fail[ure] to comply with the MSA." Accordingly, setting aside question No. 2 for the moment; the answer to question No. 1, if referring to the crew's use of drugs on the site, does not conflict with the answer to question No. 3. Rather, together, the answers convey the jury's belief that the failure to comply with

---

[2]There was no expert evidence presented regarding a level of impairment that corresponded to the levels tested, when the drug would, in scientific probability, have been taken, whether or not it could be scientifically concluded that the drug was taken on the job, or how long cocaine remains in one's system and could have been detected without continuing to produce significant impairment.

[3]There is no indication that the jury concluded, or that the trial court found, that any MSA violation was a *material* breach of contract.

the MSA did not result, or was not proven to result, in the temporary loss of the hole or any of the damages incurred in the fishing operation.

We next turn to question No. 2, which generally asked—"Did Black Hawk fail to comply with any warranty or representation expressed in the MSA?" In question Nos. 1 and 3, the jury was asked whether Black Hawk failed to comply with the MSA and what sum of money would compensate Lario for "its damages that resulted from Black Hawk's failure to comply with the MSA?" Question No. 3 further allowed the jury to answer the question if it answered "Yes" to question No. 1 *or* to question No. 2.[4] Given the phrasing of the questions, it may have appeared to a jury to be a *separate* breach inquiry—one regarding breach of warranties—for which there was no *verbally matching* follow-up damages question submitted by Lario for the jury to answer. Under the possibilities given to the jury to consider, at least one justifies a zero-damages verdict. The jury could have found that Black Hawk failed to comply with a warranty or representation—any warranty or representation—expressed in the MSA but that $0.00 was the appropriate sum of money to compensate Lario for its damages as a result of Black Hawk's failure to comply with *that* warranty or representation.

Moreover, there is no money-damage finding from any breach of the MSA that exceeds $0.00, and no-damages question was requested by Lario or presented to the jury using question No. 2's specific language of "fail to comply with any warranty or representation expressed in the MSA."[5] A "fail[ure] to comply with the

---

[4]The instruction that preceded question No. 3 is in the disjunctive and reads, "If you answered 'Yes' to Question No. 1 OR 'Yes' to Question No. 2, then answer the following question." (emphasis added).

[5]In this regard, it was Lario's burden to obtain affirmative answers to jury questions as to the necessary elements of its cause of action. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007) (citing *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex. 1990)). The use of a broad-form jury question for a cause of action does not mean that the question may omit the necessary elements of the claim. *Diamond Offshore Mgmt. Co. v. Guidry*, 171 S.W.3d 840, 844 (Tex. 2005).

11

MSA" is not necessarily equivalent to "fail[ing] to comply with any warranty or representation expressed in the MSA [that was] a proximate cause of Lario's damages." The jury's answer to question No. 2, without a corresponding damages question, becomes superfluous. *See Barclay v. Johnson*, 686 S.W.2d 334, 338 (Tex. App.—Houston [1st Dist.] 1985, no writ); *see also Security Sav. Ass'n v. Clifton*, 755 S.W.2d 925, 933 (Tex. App.—Dallas 1988, no writ) (A finding becomes immaterial when the jury's answer to one or more other jury questions renders the finding in question void of legal significance.).

Further, in submitting question No. 2, the trial court inquired about Black Hawk's failure to comply with any MSA warranty or representation, and whether that failure "proximately caused" Lario's damages. Proximate cause is not the causal standard that is applied in a suit for breach of contract. *See Abraxas Petrol. Corp. v. Hornburg*, 20 S.W.3d 741, 758 n.12 (Tex. App.—El Paso 2000, no pet.); *see also McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 209 (Tex. 1985). Instead, in order to recover compensatory damages, the plaintiff must establish that he suffered some pecuniary loss as a result of the breach. *Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020) (citing *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952)). The evidence must show that the damages are the natural, probable, and foreseeable consequence of the defendant's conduct. *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981); *Winograd v. Clear Lake City Water Auth.*, 811 S.W.2d 147, 156 (Tex. App.—Houston [1st Dist.] 1991, writ denied). The absence of this causal connection between the alleged breach and the alleged damages precludes recovery. *See Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.) (citing *Winograd*, 811 S.W.2d at 156).

To complicate issues, many of Black Hawk's alleged acts or omissions of breach were also pled by Lario as acts of negligence, and question Nos. 2 (breach)

and 4 (negligence) each repeat the same definition of proximate cause. Importantly, the jury's answer to question No. 4 shows that the jury rejected any negligence claims for the acts or omissions by Black Hawk, including that those alleged acts or omissions that were a proximate cause for "the damages to Lario's property." As a result, the questions for breach of warranty/representation and negligence resulted in opposite jury answers even though the acts or omissions to be considered could be the same. Further, Black Hawk's employees testing positive for cocaine, while a breach of the MSA, could not by itself be the proximate cause of the incident without some additional, other negligent act, and the jury rejected a concomitant negligent act by answering "No" to question No. 4.

Finally, the jury necessarily rejected Lario's argument under the MSA that a bona fide dispute existed between the parties when it answered question No. 7 "Yes" as to Black Hawk's counterclaim. That rejection circumstantially communicates that the jury believed that Black Hawk was not responsible for the damages claimed by Lario. The jury's rejection of Lario's bona fide dispute claim indicates that the jury also rejected the evidence and arguments presented by Lario regarding the claim. Strunk, the vice-president of engineering at Lario, when asked to explain the bona fide dispute, testified that "[i]t was the job itself that caused the fishing operation . . . that Black Hawk caused some of that work to be done." He agreed that "the cause and responsibility of the tubing parting . . . is the dispute that [he was] speaking of before." In closing argument, Lario argued that "[Black Hawk] messed this up and we've got an issue with paying you for that. . . . That's what the bona fide dispute is." Accordingly, by its answer to question No. 7, the jury incidentally rejected Lario's incident and damages *causation* argument.

Because Lario bore the burden of proof on the issue that any claimed breach of the MSA resulted in some damages, "it must demonstrate on appeal that the

13

evidence conclusively established the fact of damages as a matter of law." *IBM*, 573 S.W.3d at 235.  However, Lario is unable to do so.

> 3. *What is "The Reasonable and Necessary Cost to Finish the Uncompleted Work?"*

In question No. 3, the jury was instructed to consider only "[t]he reasonable and necessary cost to finish the uncompleted work."  While "cost" is not defined in the charge, some *or all* of the reasonable and necessary costs of fishing pipe and equipment out of the wellbore might also be included in the phrase "cost to finish the uncompleted work."  If so reasoned by the jury, the fact that Lario benefited from the work that was done by Black Hawk without paying Black Hawk the amount it had invoiced—$825,292.49 (a number that is too specific to refer to anything other than the fishing invoices submitted by Black Hawk to Lario), results in Lario not being out of pocket *anything* as to the reasonable and necessary "costs to finish the uncompleted work."  Because Lario had not paid the charges that Black Hawk invoiced for the completed work, the jury could have reasonably concluded that, this being a virtual offset, Lario would have sustained "$0.00" in damages.

Further, Lario had the burden to prove the existence and amount of those damages for which they were seeking in question No. 3.  Because Lario bears the burden of proof, the record must conclusively establish all vital facts in support of this issue—and here, the record does not.  *See Triton Oil*, 644 S.W.2d at 446.  The question itself limits the amount of damages to the cost to finish the work—but there is nothing in the record to establish what constitutes "finish[ing] the uncompleted work," from when that is to be gauged, nor what costs were associated with finishing such work.  The record merely includes a twenty-six-page document that summarizes all costs purportedly associated with the Peggy 101 Well workover from May 2017 to June 2018, which included the outstanding invoices and monies owed to Black Hawk for the workover job and the fishing job.  Importantly, question No. 2

encompasses *any* violation of warranties or representations in the MSA. This does not limit any such violations to "work necessary to finish the uncompleted work."[6]

As we have said, for Lario to conclusively establish that it suffered its claimed damages, the evidence must leave no room for ordinary minds to differ as to the conclusion to be drawn therefrom. *See id.* Based on the evidence, the jury, could have reasonably found that any damages were the costs incurred by the fishing operation, which was identified as being separate from the workover job. And although there is some evidence of Lario's possible costs, the evidence here does not "conclusively establish" the existence of damages as to *the reasonable and necessary cost to finish the work*.

Lario argues that Plaintiff's Exhibit No. 18—the summary of costs incurred on the Peggy 101 Well project—and the testimony from Strunk provided uncontroverted evidence of the damages Lario suffered due to Black Hawk's breach. However, the submission of a ledger or accounting of invoices—without the additional details related to the specific damages claimed, is not conclusive proof of damages. *See Parks of Deer Creek Homeowners Ass'n, Inc. v. Hunter*, No. 02-20-00406-CV, 2021 WL 3205054, at \*3–4 (Tex. App.—Fort Worth July 29, 2021, no pet.) (mem. op.) (the submission of a ledger alone—without additional information related to the portion of the balances related to damages versus attorney's fees—was not sufficient to conclusively prove damages.). Here, the entries for Lario's summary of costs identified vendors, the description of service, batch, invoice date, service date, and account date. Strunk indicated that the total cost on the final page of the summary was $6.816 million, and that Lario was seeking this entire amount from Black Hawk. However, neither the summary—nor the testimony—identify the

---

[6]Lario did not calculate, suggest, limit, or differentiate an amount of damages as to question No. 3 in their closing argument; it only mentioned that the jury should "award damages to Lario."

reasonable and necessary cost to finish the work. Nor does the document—or the testimony from Strunk—indicate that these are actual damages suffered by Lario rather than merely an accounting of invoices received. Because Lario had not paid Black Hawk and Lario did not provide evidence that other vendors had been paid, the summary itself is insufficient to establish the existence of damages in that amount—or in any amount.

Additionally, the jury determined that there was no negligence on the part of Black Hawk related to the incident—Lario also failed to show which costs incurred were related to the breach but not to the negligence claim. The jury may have related all damages claimed by Lario to the negligence allegations, allegations which they rejected by answering "No" to question No. 4. Further, as Lario had made no payments for Black Hawk's services as it related to the workover or fishing jobs, the jury could have reasonably determined that Lario suffered no damages because of Black Hawk's alleged failure to comply with the MSA.

For all the reasons discussed above, the evidence, when viewed in the light most favorable to the prevailing party, supports the jury's finding of $0.00 damages.

We overrule Appellant's first issue.

B. *Factual Sufficiency*

In its second issue, Lario argues, alternatively, that the jury's $0.00 award was arbitrary and against the great weight and preponderance of the evidence.

To successfully challenge the factual sufficiency of the evidence to support an adverse finding on an issue on which it bore the burden of proof at trial, the appellant must demonstrate that the finding is against the great weight and preponderance of the evidence. *Dow Chem.*, 46 S.W.3d at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We must consider and weigh all of the evidence and will set aside a verdict only if it is so contrary to the overwhelming weight of the evidence such that it is clearly wrong and unjust. *Dow Chem.*, 46

16

S.W.3d at 242; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). It is the factfinder's role to evaluate the credibility of the witnesses and reconcile any inconsistencies or conflicts in the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Generally, the factfinder may believe or disregard all or any part of the testimony of any witness. *Id.* at 774–75. We will not substitute our opinions on credibility for those of the factfinder. *See Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019).

First, Lario provided no evidence that all invoices had been paid. At the time of trial, Lario had not paid any of the Black Hawk invoices, and Black Hawk emphasized that there was no evidence presented to support that any of the other vendors had been paid.

Next, Serrano testified that the BOP passed the function test on the day of the incident, and that Lario wanted the Black Hawk crew to keep an eye out for "bad pipe." The pipe was expected to be corroded and have holes in it, and they found several holes before the incident occurred. The jury was provided images of the pipe that separated, and evidence was presented that the pipes were corroded and weak and that the condition of the pipes compromised the integrity and strength of the threaded connection between pipes which caused the separation and subsequent well damage. Watson further testified that the BOP did not cause the separation of the pipes.

The only evidence presented by Lario to support its argument that Black Hawk could have been responsible for the incident, related to the subsequent positive drug tests of Black Hawk employees and the testimony from Stuart Peterson, the President and CEO of Steel Energy and Black Hawk, in which he stated that all new hires for Black Hawk would have been evaluated prior to being hired and that each new employee was required to complete a three-day new hire training program. The new hire training and hiring procedures were kept in employee personnel files.

17

Peterson was questioned about the apparent absence of corresponding safety training certificates, credential checks, or motor vehicle reports, to which he responded by pointing out that several policy acknowledgements had been signed and were included in the file.

Lario argued to the jury that the lack of verification of three-day new hire training documentation and the absence of safety certifications was evidence that the Black Hawk crew on the Peggy 101 Well was not qualified to work on the site. But rig superintendents and rig managers hire crew members. As to safety enforcement and apparent training, the jury found that the Black Hawk crew was not negligent in answer to question No. 4; Black Hawk terminated the employment of the three employees who tested positive for drug use immediately upon receiving the lab results; and, the crew provided for the fishing project was deemed "excellent."

Lario relies on *IBM* to support its assertion that we *must* reverse and remand for a damages calculation because Lario believes it conclusively established the existence of damages. *IBM*, 573 S.W.3d 224. The court in *IBM* held that, in circumstances where a party seeking damages has conclusively established the existence of damages, even if the amount has not been sufficiently established, it can be enough to reverse an award of zero-damages. *Id.* at 235–236. The situation here differs because in *IBM*, the party disputing the award of $0.00 objected at the time the jury returned the verdict. *See id.* Lario did not. Secondly, this case differs from *IBM* because in *IBM*, the evidence established that Lufkin suffered out of pocket damages as a result of the breach of contract: the value Lufkin received was less than the amount it paid IBM for the Express Solution system. *Id.* Here, Lario had not paid Black Hawk at all for the services it rendered. Although, as in *IBM*, we cannot ascertain what the jury relied upon in determining specifically how Black Hawk breached the MSA, from our review of the record, the only evidence presented at trial related to alleged breaches that occurred prior to the well incident—on May 8,

2017, or May 9, 2017. Strunk testified that the payments to Black Hawk were withheld because there was a bona fide dispute about whether Black Hawk caused some of the work to be done. As we have discussed, this would amount to a finding of damages following acts of negligence rather than based on a breach of contract. Thus, while *IBM* does instruct an appellate court to reverse for a damages calculation when the existence of damages have been proven, those circumstances are not present in this case. *See id.* at 236–37.

Lario cites to several cases as support for its argument that an award of $0.00 damages based on a jury question following a "finding" of liability is automatically against the great weight and preponderance of evidence, but each case relied upon by Lario is distinguished below from the case before this court.

First, the question before this court is not one where the jury found that there was negligence and then refused to award damages. *See Horton v. Denny's Inc.*, 128 S.W.3d 256, 258, 262 (Tex. App.—Tyler 2003, pet. denied) (The jury found there to be negligence and awarded Horton less than the established medical costs— but not $0.00—the court of appeals reversed as to the damages established by medical bills for the injury related to the negligent act.); *Jacobs v. York*, 662 S.W.2d 137, 138 (Tex. App.—Fort Worth 1983, no writ) (In a personal injury case where the parties had no prior contract together, and the jury found there was negligence but awarded $0.00; the court of appeals reversed.).

Second, the jury was not presented with a range of possible damages, nor was the jury limited to one or two choices as to damages. *See Brock Indep. Sch. Dist. v. Briones*, No. 02-07-00002-CV, 2008 WL 704174, at *2–3 (Tex. App.—Fort Worth March 13, 2008, no pet.) (mem. op.) (The court of appeals held that when the evidence supports a wide range of damages, rather than only one or two options, it is appropriate to receive a jury award in the range of damages.).

Third, there was no separation of costs associated with the cost to finish the uncompleted work in this case—as required by question No. 3—nor was the evidence presented uncontroverted. *See Ginn v. NCI Bldg. Sys., Inc.*, 472 S.W.3d 802, 843–45 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (The jury was asked to answer two separate questions as to types of damages suffered and it disregarded agreed upon evidence as to the value of the damages for one question; restricted stocks were transferred as part of a separation agreement, the value of which was undisputed by either party.); *Heritage Op., L.P. v. Rhine Bros., LLC*, No. 02-10-00474-CV, 2012 WL 2344864, at *7–8 (Tex. App.—Fort Worth June 21, 2012, no pet.) (mem. op.) (Uncontroverted evidence was presented to show the loss of sales resulting from a non-compete clause, but the jury awarded zero damages; the court of appeals reversed on the grounds that at least some damages were proven, and the calculation was a fact question for the jury.); *MNC Spring Shadows, L.P. v. Kearney, L.L.C.*, No. 14-10-01180-CV, 2011 WL 4794949, at *2–3 (Tex. App.—Houston [14th Dist.] Oct. 11, 2011, no pet.) (mem. op.) (There was undisputed testimony as to damages—including unpaid rent, CAM fees, tax charges, and insurance charges—but the jury only awarded tax charges; the court of appeals reversed and modified the actual damages awarded.); *Harton v. First Victoria Nat'l Bank*, No. 13-10-00371-CV, 2011 WL 1935605, at *5–6 (Tex. App.—Corpus Christi–Edinburg May 19, 2011, pet. denied) (mem. op.) (The trial court's grant of a judgment notwithstanding the verdict regarding damages was proper because the evidence conclusively established the damages awarded in the judgment.).

Fourth, this is not a case regarding the sale of goods, in which the buyer is statutorily guaranteed damages for the amount previously paid. *See Aztec Corp. v. Tubular Steel, Inc.*, 758 S.W.2d 793, 800–01(Tex. App.—Houston [14th Dist.] 1988, no writ) (A goods contract, governed by the UCC, in which an aggrieved buyer may recover as much of the contract price as paid—and over the contract price when

20

findings of cost of cover, incidental or consequential damages are proven; the jury awarded $35,000 in damages for the recovery price under the contract, despite evidence that the statutorily allowed damages were $64,739.00, and the award was modified to reflect the recovery price.).

Fifth, this case does not involve the reliability of expert testimony to prove Lario's damages. *See Green v. Crawford*, 662 S.W.2d 123 (Tex. App.—Tyler 1983, writ ref'd n.r.e.) (in a case involving expert testimony as evidence of damages–while expert testimony is not automatically conclusive, there is a narrow exception, which was met in the case, when an expert testimony can be conclusive).

And finally, this case does not produce a manifestly wrong and unjust result. There is no evidence that Lario has paid any of the invoices in their summary document, and the jury determined that Black Hawk was not at fault for the incident that resulted in the fishing operation. *See World Access Telecomm. Grp., Inc. v. Telcom Prods., Inc.*, No. 05-04-00529-CV, 2005 WL 1983548, at * 2 (Tex. App.—Dallas Aug. 18, 2005, no pet.) (mem. op.) (the jury determined one party's breach of contract was excused but the other party's breach was not but still awarded zero damages, the court of appeals held that the award of zero damages was against the great weight and preponderance of the evidence).

The jury is the sole judge of the credibility of the witnesses and is assumed to have reconciled any inconsistencies in the evidence. *See Golden Eagle Archery*, 116 S.W.3d at 761. Here, as discussed above, while the jury could have determined that Black Hawk violated the MSA when some of its employees tested positive for cocaine, the jury was free to find that fact inconsequential. Evidence presented through Black Hawk's expert, Watson, indicated that the pipe separation was the result of corrosion and that the BOP did not cause or contribute to the separation of the pipe or the damage to the pipe. Thus, we cannot say that the jury's acceptance of that expert testimony was unreasonable.

The jury was not instructed to answer question No. 3 and find total damages *regardless of the cause* of those damages; rather, it was specifically directed otherwise—to calculate the amount of money that would "compensate Lario for its *damages that resulted from Black Hawk's failure to comply with the MSA*." (emphasis added). Further, Lario cannot complain of the jury's answer to question No. 3 when it did not object to the wording thereof that restricted the jury's answer to the "reasonable and necessary cost to finish the work" without further definition. Finally, Lario did not present any evidence as to what damages resulted from the alleged breach of the warranties and representations in the MSA—thus, the jury was free to determine that zero damages resulted with respect to the cost to "finish the uncompleted work." We may not substitute our opinions on credibility for those of the factfinder. *Windrum*, 581 S.W.3d at 781. Considering and weighing all of the evidence, we cannot say that the award of $0.00 is against the great weight and preponderance of the evidence.

We overrule Appellant's second issue.

### Issue Three: Material Breach and Continuing Performance

Lario's claims in its third issue on appeal that Black Hawk is barred from recovering under the MSA, because the jury found that Black Hawk breached the MSA. Lario argues that Black Hawk "unquestionably breached the MSA first," therefore, the $825,292.49 jury award in favor of Black Hawk should be reversed.

Generally, "when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004). The nonbreaching party must elect between two courses of action: either continuing performance or ceasing performance. *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887–88 (Tex. App.—San Antonio 1996, writ denied) (op. on reh'g) (citing *W. Irrigation Co. v. Reeves Cnty. Land Co.*, 233 S.W.2d 599, 602 (Tex.

22

App.—El Paso 1950, no writ)). If the nonbreaching party elects to treat the contract as continuing and insists that the party in default continue performance, the previous breach constitutes no excuse for nonperformance on the part of the party not in default, and the contract continues in force for the benefit of both parties. *Dallas Berkshire Partners, Ltd. v. James French Photography, Inc.*, No. 05-98-01352-CV, 2001 WL 200144, at \*5 (Tex. App.—Dallas Mar. 1, 2001, pet. denied) (mem. op.); *see also Long Trusts v. Griffin*, 222 S.W.3d 412, 415–16 (Tex. 2006) (per curiam). The nonbreaching party "conclusively chooses to treat the contract as continuing if it seeks to benefit from the contract after the other party's material breach." *Dowtech Specialty Contractors, Inc. v. City of Weinert*, 630 S.W.3d 206, 216 (Tex. App.— Eastland 2020, pet. denied) (quoting *Man Indus. (India), Ltd. v. Midcontinent Express Pipeline, LLC*, 407 S.W.3d 342, 368 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)).

Here, Lario claims that "the moment [Black Hawk's] untrained and inexperienced crews began to work under the influence of cocaine" they breached the terms of the MSA. Lario argues that the jury affirmed these alleged breaches in its answers to question Nos. 1 and 2. Despite this assertion, the jury questions do not specify *what* the potential breach was, nor do they identify whether Black Hawk was the first to breach the MSA.

There is also no finding that any breach by Black Hawk was material. But here, the uncontroverted evidence is consistent with Black Hawk's position that Lario chose to treat the contract as continuing following the incident that it claims and identifies to be the initial breach. Lario benefitted from approximately four additional months of work from Black Hawk. Cochran testified that the Black Hawk crew returned to work after the incident to assist with the fishing operation. Cochran and another Lario employee signed Black Hawk's daily work tickets, indicating that the hours worked—and amount to be charged—which was approved by a Lario

23

employee throughout the entirety of Black Hawk's work on the Peggy 101 Well. Young described the work done by Black Hawk as "excellent" and that the crew had "very, very good knowledgeable hands." Additionally, it was confirmed by Lario that when the fishing work began, it was "a continuation of the job" Black Hawk had already been hired for. The MSA was meant to govern the entirety of the work between Lario and Black Hawk, regardless of whether the scope of the work changed from workover to fishing.

The evidence shows that Lario—as the claimed nonbreaching party—not only chose to treat the contract as continuing but expected the contract to continue. *See Long Trusts*, 222 S.W.3d at 415–16. Because Lario sought further benefit from Black Hawk following the alleged material breach, the contract continued in full force throughout the duration of the work. As a result, the amount of $825,292.49—the combined amount owed on the seven invoices shown to be outstanding (and ultimately awarded by the jury)—had not been previously discharged by any material breach. We overrule Appellant's third issue.

### Issue Four: No Bona Fide Dispute

In its fourth issue, Lario claims that, because there was a bona fide dispute as to the amount owed to Black Hawk, the MSA excused Lario's obligation to pay Black Hawk's invoices. Because of this, Lario asks us to reverse the jury's verdict that awarded $825,292.49 to Black Hawk.

Neither Lario nor Black Hawk claims that the MSA is ambiguous. A definition of "bona fide" was provided to the jury in the charge and a question on Lario's claim of bona fide dispute was presented to the jury. Lario is challenging the jury's determination that there was *not* a bona fide dispute under the MSA which could preclude the payment of the Black Hawk invoices. *See Miller v. Good Marble & Tile Co.*, 37 S.W.2d 323, 324 (Tex. App.—Texarkana 1931, writ dismissed w.o.j.) (the question as to whether or not a bona fide dispute existed was a question of fact

24

for the jury).  As we have said, factual sufficiency dictates that we defer to the findings of the jury, and we do not inject our credibility determinations in place of the factfinders.  *See Windrum*, 581 S.W.3d at 781; *Golden Eagle Archery*, 116 S.W.3d at 761.

The trial court defined "Bona Fide" in the charge as "[m]ade in good faith; without fraud or deceit."  Testimony was presented to the jury that Lario withheld payment to Black Hawk because Lario believed Black Hawk was responsible for the job which caused the necessity for the fishing operation.  However, unchallenged on appeal is the jury's verdict that Black Hawk did not negligently cause any damage to Lario's property.  Lario knew of and allowed Black Hawk to continue working on the Peggy 101 Well following the incident, as evidenced by the daily logs signed by Lario employees, as well as the receipt of *seven* separate invoices for work performed.  In accepting the extensive, continued work of Black Hawk without paying for it, the jury could reasonably have perceived bad faith, fraud or deceit on the part of Lario and rejected Lario's claim of a bona fide dispute.  Strunk testified that the $6.814 million included the outstanding fees for the work done by Black Hawk for the workover and fishing jobs, and that this work amounted to reasonable and necessary fees.

Further, expert testimony was provided that established that the pipe separated due to corrosion, rather than negligence.  It is possible, based on this testimony, that the jury concluded Lario was not acting in good faith in withholding payment, but still allowing—and expecting—Black Hawk to continue to work on the project.  Therefore, based on the evidence, we cannot conclude that the jury finding that there was no bona fide dispute is contrary to the evidence.

We overrule Appellant's fourth issue.

*Black Hawk's Conditional Cross-Appeal*

In their conditional cross-appeal, Black Hawk asks that, should we reverse the jury's verdict, we consider the MSA's indemnity clause and its impact on whether Lario was able to bring any claims against Black Hawk at all.

Because we have overruled each of Lario's issues on appeal, we do not reach Black Hawk's conditional cross-appeal. *See* TEX. R. APP. P. 47.1; *see also Parker v. RAD Trucking, LTD.*, No. 04-22-00656-CV, 2024 WL 590442, at *8 (Tex. App.—San Antonio Feb. 14, 2024, no pet. h.); *Blue Star Op. Co. v. Tetra Techs., Inc.*, 119 S.W.3d 916, 922–23 (Tex. App.—Dallas 2003, pet. denied).

*This Court's Ruling*

We affirm the judgment of the trial court.


W. BRUCE WILLIAMS

JUSTICE


May 9, 2024

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.